MODERN CONTINENTAL/OBAYASHI vs. MASSACHUSETTS
COMMISSION AGAINST DISCRIMINATION & another.[1]

Suffolk. January 6, 2005. - September 7, 2005.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, & SOSMAN, JJ.

*Anti-Discrimination Law,* Sex. *Employment,* Discrimination, Sexual harassment.

This court concluded that an employer may be held liable for failing to respond reasonably to acts of sexual harassment of which it is aware or reasonably should be aware, even though the harassing acts are perpetrated by someone who is not an agent or employee of the employer [104-108], and that the standard for imposing liability in such an instance is whether the employer took prompt, effective, and reasonable remedial action once it realized or should have realized that one of its employees was being victimized by a third party's harassment [108-110].

In a civil action seeking review of a decision of the Massachusetts Commission Against Discrimination (commission) finding an employer liable for sex discrimination when it failed to protect one of its employees from harassment by employees of one of the employer's subcontractors, the judge erred in granting judgment on the pleadings in favor of the commission, where, as a matter of law, the remedial steps that the employer undertook satisfied its obligation to take prompt action that was reasonably calculated to end the harassment being perpetrated on its employee. [110-118]

CIVIL ACTION commenced in the Superior Court Department on March 26, 2002.

The case was heard by *Carol S. Ball,* J., on a motion for judgment on the pleadings.

The Supreme Judicial Court on its own initiative transferred the case from the Appeals Court.

*Richard D. Wayne* for the plaintiff.

*Beverly I. Ward* for Massachusetts Commission Against Discrimination.

*James B. Cox* for Whatleigh Edmands.

[1]Whatleigh Edmands.

*John D. O'Reilly, III, Karl J. Gross, & James F. Grosso*, for Associated General Contractors of Massachusetts, Inc., & others, amici curiae, submitted a brief.

SOSMAN, J. Modern Continental/Obayashi (Modern) sought judicial review of a decision by the Massachusetts Commission Against Discrimination (MCAD) finding Modern liable for sex discrimination when Modern failed to protect one of its employees from harassment by employees of one of Modern's subcontractors. A judge in the Superior Court affirmed the MCAD's decision, and Modern appealed. We transferred the case to this court on our own motion. Although we reject Modern's contention that an employer can never be liable for sexual harassment perpetrated by outside third parties, we agree that, on this record, Modern satisfied its obligation to its employee by making reasonable efforts to remedy the harassing conduct. The MCAD's decision to the contrary is not supported by substantial evidence, and instead reflects the imposition of an erroneous standard higher than reasonableness. We therefore reverse the judgment.[2]

1. *Facts and procedural background.* On January 18, 1994, Whatleigh Edmands, a female employee of Modern, filed a complaint with the MCAD charging Modern with sex discrimination based on sexual harassment. She subsequently amended her complaint to add Mohawk Construction (Mohawk), one of Modern's subcontractors, as a respondent, but ultimately settled her claim against Mohawk. She amended her complaint again to add a claim that she was constructively discharged from Modern as a result of a hostile work environment. The investigating commissioner found probable cause to support the claim of sexual harassment, but no probable cause to support the claim of constructive discharge. The matter went forward to a public hearing solely on the sexual harassment claim. The hearing commissioner's findings on that claim are as follows, supplemented by uncontested details from the record.

---

[2]We acknowledge the amicus brief submitted by the Associated General Contractors of Massachusetts, Inc.; the Building Trades Employers Association of Boston and Eastern Massachusetts; the Construction Industries of Massachusetts; the Foundation and Contractors Association; and the Massachusetts Aggregate and Asphalt Pavement Association.

Modern was the successful bidder on a public works project to prepare the eastern approach to the Ted Williams Tunnel, a portion of the Central Artery/Tunnel project (the so-called "Big Dig"). Modern subcontracted the iron work on the project to Mohawk. As a condition of its contract, Modern and all of its subcontractors entered into a project labor agreement with the construction trades unions, which required, inter alia, that all craft employees (including foremen) be union members, that all such employees be hired through exclusive union hiring halls, and that workers not be disciplined or terminated except for "just cause."

Whatleigh Edmands, an apprentice carpenter, was hired by Modern through the carpenters' union in October, 1993. She worked with four or five other carpenters on a crew supervised by foreman Charles Cofield. Numerous other tradespeople were on the site, including ironworkers employed by Mohawk. On November 3, 1993, Edmands was using one of the portable toilet facilities on the site when she heard scratching noises outside. Looking up, she saw someone peering through an air vent near the roof. The peeper was wearing a brown hard hat of a type worn exclusively by the ironworkers. When Edmands tried to exit, she found herself unable to open the door, as a tie wire had been fastened around the toilet enclosure.[3] She screamed, and someone cut the tie wire to let her out. As she came outside, she saw approximately twelve men in the area. She yelled at them, demanding to know who had spied on her and tied her in the portable toilet facility. None of them responded.

Later that day, Edmands informed Cofield of the incident, and Cofield assured her that he would "take care of this." The following day, Richard Ell, the steward for the carpenters' union, came to see Edmands about the incident, and, the next day, returned to see Edmands with Jay Kennedy, the steward for the ironworkers' union. Ell informed Edmands that one of the ironworkers, Joe Roselli, had admitted responsibility for tie wiring Edmands into the toilet facility. Ell asked Edmands if she wanted to have Roselli apologize in person, suggesting that seeing him might enable her to identify him as the person who had

---

[3]Edmands testified that such tie wire was used by ironworkers at the site.

peered in through the vent. Although Edmands said that she did not wish to speak to Roselli, Roselli was brought over and made his apologies to her. He admitted that he was the one who had fastened the tie wire, but claimed it was a prank that he intended to play on another ironworker, and that he had thought someone else was using the toilet facility at the time.[4] Roselli denied that he had looked through the vent. After hearing from Roselli, Ell asked Edmands if she could identify Roselli as the person who had peered in through the vent. She could not. At the hearing, Edmands testified that Roselli was not the peeper.

On November 8, five days after the incident, Edmands and Ell met with Modern's project manager, John McNamara. McNamara indicated that he would speak with the ironworkers' business agent to have Roselli removed from the site. McNamara also suggested that Edmands view the videotapes of the work site to see if those tapes would help her identify the person who had peered in through the vent. Thereafter, McNamara contacted Mohawk's president, requesting that Mohawk investigate the matter. He also asked Mohawk to transfer Roselli off the job site, but Mohawk refused to remove him or to discipline him.

On November 10, Edmands noticed that the portable toilet facility had been defaced with graffiti, consisting of the word "HERS" written above a drawing of an eye and, below the eye, a crude caricature of female genitalia. Edmands understood that the graffiti was directed at her, and that it referred to the prior week's incident. She encountered Cofield and Ell a short time later; Cofield again promised to "take care of this," and the graffiti was removed.

Following up on McNamara's suggestion about the videotapes, Edmands reviewed the tapes on November 15. However, the camera angle was such that, despite reviewing the tapes twice, Edmands still could not make any identification. Two days later, George Coblyn, Modern's equal employment opportunity officer, spoke with Edmands and asked her to give him a written statement concerning both the original peeping

---

[4]The hearing commissioner did not credit Roselli's claim that he had not known that Edwards was the one using the portable toilet at the time he fastened the tie wire. We will not disturb that credibility determination.

and tie wiring incident and the graffiti incident. She provided him with such a statement two weeks later. That statement contained no identification of either the perpetrators or of any potential witnesses. Coblyn also contacted employees and officials at Mohawk. They refused to provide him with any information concerning the identity of the perpetrator of either the peeping incident or the subsequent graffiti.

On November 23, Coblyn gave a brief presentation on the subject of sexual harassment, including a warning that sexual harassment would not be tolerated at the site, at a regular gathering of workers, managers, and union representatives referred to as "tool box talks."[5] However, very few persons attended that particular tool box talk.[6]

Without Edmands's knowledge, her union initiated a grievance with respect to these incidents, and on December 7, she was called to attend a step one grievance meeting. In addition to various officials from Modern, the meeting was attended by the ironworkers' union business agent, Sonny Oliver; the ironworkers' steward, Jay Kennedy; and Roselli. Oliver, on

---

[5]Coblyn testified that the subject of sexual harassment was covered in subsequent tool box talks as well, and that, whenever he attended such a talk, he would address some issue pertaining to "equal employment opportunity." The sign-in sheets for these talks include in their heading a reference to the subjects raised at the particular session, and the topic of sexual harassment is referenced on those sheets for the sessions conducted on November 23, 1993; January 3 and 18, 1994; February 10, 1994; March 7, 1994; April 13, 1994; and May 3, 1994. While the hearing commissioner's findings reference only the November 23, 1993, session, there is no finding to the effect that he discredited either Coblyn's testimony or the supporting documentation with respect to the later sessions at which sexual harassment was also addressed.

[6]The hearing commissioner found that approximately twenty-five of the 600 workers on site were in attendance at that session. Modern protests that, at that time, due to an ongoing unrelated dispute with certain of the unions, many workers were refusing to sign the attendance sheets at tool box talks. Modern thus contends that the actual number of workers attending was greater than that reflected on the attendance sheets. The hearing examiner either did not credit this explanation, or, in finding only the "approximate[]" number in attendance, the hearing examiner concluded that this discrepancy was relatively minor. This is a factual finding, supported by the evidence, that we will not disturb. Whatever the precise number, the vast majority of workers at the site did not hear Coblyn's presentation that day. As to subsequent tool box talks addressing sexual harassment (see note 5, supra), the sign-in sheets again reflect that attendance was very low.

behalf of the ironworkers, dominated the meeting.[7] Oliver denied that anyone had peered into the toilet facility while Edmands was using it. He also insisted that the facility had been shut with a tie wire in order to prepare for its removal by a crane (a version contrary to Roselli's prior admission that he had tie wired the facility as a prank). McNamara repeated his request that Roselli be transferred off the project. At that, the ironworkers threatened to strike if Roselli were removed.

Oliver also raised issues concerning the cleanliness of the toilet facilities. There ensued some discussion concerning the security and cleaning of the facilities, resulting in a "general agreement" that certain of the toilets would be designated for exclusive use by female workers (instead of being entirely unisex, as they had been until that point), and that they would be separated from the men's toilets, set off by fencing, and secured with padlocks. However, from the date of the original November 3 incident onward, Edmands had opted to use the bathroom facilities at a building one-quarter mile away, and she continued to do so even after these additional security measures were later instituted.

Although unable to convince Mohawk to remove Roselli, and unable to uncover the identity of any other perpetrator, McNamara revised the work schedule at the site so that iron work would be done at a different location (some 500 to 700 yards from where Edmands worked) and on a different shift. Although Edmands still would encounter Roselli (and other ironworkers) at shift changes, she would not be working with ironworkers in the immediate vicinity.

McNamara had been skeptical of the efficacy of padlocking the newly-designated female toilet facilities, but he carried through with the ordering of separate facilities, the placement of signage, the installation of padlocks, and the issuance of padlock keys to female employees.[8] Within a few weeks, the padlocks

---

[7]The hearing commissioner's findings characterized Oliver as the "most vocal participant" at the meeting. Edmands's testimony was that she recalled "mostly Sonny Oliver talking, because he did a lot of talking," and that Oliver "just talked and talked and talked and said his version of the story. He was very loud and aggressive."

[8]Consistent with her prior decision to use the bathroom facilities in a more

on the women's toilets disappeared. Some fencing was erected, but quickly fell down or was removed. And, instead of placing the facilities in separate locations, the women's toilets were frequently placed side by side next to the men's toilets.

In February, 1994, a step two grievance meeting was held, attended by Edmands, officials from the carpenters' union, and officials from Modern. Although she was not using the facilities in any event, Edmands complained that Modern had failed to carry through on its agreement to separate, fence, and lock the women's portable toilets. Modern took the position that fencing had been a suggestion at the prior meeting, but not an agreed item. At the step two meeting, it was agreed that the female facilities would be kept separate, surrounded by fencing, and locked. In addition, a security monitor would be hired, assigned to report on any further problems, including any incidents of sexual harassment or graffiti.[9] Finally, Modern confirmed that Roselli had been moved to a different location and different shift. Based on the results of the step two grievance meeting, the carpenters' union, with Edmands's agreement, decided not to take the matter to arbitration.

On March 21, 1994, as Edmands was entering her work trailer, she encountered her foreman, Cofield, erasing graffiti. Edmands did not see the graffiti, but Cofield informed her that it had consisted of depictions of male and female genitals.

By late March or early April, 1994, the task that ironworkers had been assigned at a different location and shift was completed. As a result, Roselli and the ironworkers returned to the day shift, working in a location near Edmands.[10] Shortly thereafter, the monitor hired to patrol the toilet facilities discovered some graffiti in the men's toilet facilities that

distant building instead of the portable facilities on site, Edmands gave her padlock key to another female employee.

[9]Although not all of these security precautions were taken immediately after the step two grievance meeting in February, 1994, Edmands acknowledged in her testimony that they were implemented by sometime in March.

[10]At some point (the date is not specified), a group of ironworkers working near Edmands and another member of her crew began to scream, squeal, and make animal noises, which she characterized as "almost obscene." It is unclear whether this occurred prior to the relocation of the ironworkers or subsequent to their return to the area where Edmands worked.

referred to Edmands in vulgar terms, and brought it to Coblyn's attention. (Edmands did not see it.) Coblyn in turn reported this new outbreak of graffiti to McNamara, who instructed him to draft a memorandum, to be distributed to all workers at the site over McNamara's signature, responding to the incident. Thereafter, Coblyn supplied McNamara with the requested draft memorandum.[11] Instead of distributing the notice drafted by Coblyn, McNamara drafted his own notice, which focused on the specific problem of vulgar graffiti.[12] That notice was distributed to all workers with their paychecks.

Later that month, Edmands told Coblyn that she was tired of working in an environment that made her "nervous and scared," where people were "so angry at [her] for just wanting to work." She also contacted her union and asked to be transferred to a different job site. Coblyn suggested that she could be transferred

---

[11]Coblyn's draft read as follows:

"Recently several incidents relating to sexual harassment have been brought to my attention.

"Acts of sexual harassment against another regardless of gender is a violation of Title VII of the Civil Rights Act of 1964.

"Everyone has t[he] right to exist in a workplace, free from any form of discrimination, coercion, intimi[d]ation or any manifestation that interfer[e]s, in any way, with one[']s ability to perform his/her duties.

"This memorandum is to serve notice to all employees that sexual harassment, in any form, by any individual will be de[a]lt with by strict form of punishment."

[12]McNamara's version, under the subject heading "Obscene Statements," read as follows:

"It has been brought to my attention that vulgar, obscene messages have been written on the inside walls of the port-o-johns located on this site.

"Offensive statements, whether written or verbal will not be tolerated at any time or place or for any reason, by any person employed on this project.

"Those responsible for such disgusting acts will be de[a]lt with in the most severe terms."

to work in a facility referred to as "the mill," which was part of the same project but at a removed location. Although some workers considered the mill a better assignment (as it was a more comfortable indoor site with more amenities), Edmands considered the work at the mill to be less challenging and a less valuable experience than work in the field. She nevertheless agreed to the transfer.

At the mill, Edmands's foreman, Steve Perna, remarked that, in his view, women working outside the home were adversely affecting the economy. He then clarified that he was referring to women of his own age (i.e., of an age significantly older than Edmands). When Edmands reported these remarks to an equal employment opportunity officer, the officer told her that Perna's inappropriate comments used to be worse. Edmands quit her job at Modern in May, 1994, and went to work for a technology company as a software engineer.

The hearing commissioner found that the incidents were sexual in nature or, even if not explicitly sexual in nature, that they had been directed at Edmands because of her sex; that their cumulative effect was sufficiently severe that it impacted Edmands's working environment and triggered a duty on the part of Modern to take action; and that Modern's response to these incidents of harassment was inadequate. He therefore found Modern liable for sex discrimination, awarded Edmands $50,000 in damages for emotional distress, and ordered Modern to submit and implement a plan acceptable to the MCAD to train all of Modern's Massachusetts employees concerning "the legal requirements of nondiscrimination in the workplace." Modern appealed to the full commission, which affirmed the hearing commissioner's decision in all respects and awarded Edmands attorney's fees and costs.

2. *Discussion.* a. *Employer's liability for harassing acts committed by third parties.* Modern contends that, as a matter of law, it cannot be held liable for the conduct of independent third parties over whom it did not have control.[13] The only known perpetrators of the harassing acts at the project site were

[13]Modern also argues that the incidents complained of were isolated, separated by the passage of time, and (as to some of them) not directed at or even observed by Edmands, and that the harassing conduct was therefore not

ironworkers employed by Mohawk; there was no evidence of any such acts committed by employees or agents of Modern. Modern's argument relies on the literal wording of the statutory prohibition against sexual harassment: it is an unlawful practice "[f]or an employer, *personally or through its agents*, to sexually harass any employee" (emphasis added). G. L. c. 151B, § 4 (16A). Mohawk was an independent subcontractor, and Mohawk's offending employees were not the "agents" of Modern.

However, in addition to the prohibition set forth in § 4 (16A), Modern is also prohibited from discriminating against its own employees on the basis of sex (including discrimination with respect to the "conditions" of employment), G. L. c. 151B, § 4 (1); and discrimination on the basis of sex includes sexual harassment, G. L. c. 151B, § 1 (18). An employer who passively tolerates the creation of a hostile working environment implicitly ratifies the perpetrator's misconduct and thereby encourages the perpetrator to persist in such misconduct, whatever the employer's precise legal relationship to the perpetrator. Moreover, acquiescence on the part of the employer effectively communicates to the victim of harassment that her employer does not care about the hostile environment in which she must work, a message that can only operate to exacerbate the adverse effects of that hostile environment. In this context, an employer who is not part of the solution inevitably becomes part of the problem. Bearing in mind that the statute "shall be construed liberally for the accomplishment of [its] purposes," G. L. c. 151B, § 9, we decline to read it in a manner that would absolve an employer of all responsibility for a hostile work environment merely because that hostile work environment is attributable to persons who are not the employer's own employees or agents.

---

sufficiently severe or pervasive to create a hostile working environment. See G. L. c. 151B, § 1 (18) (definition of "sexual harassment" includes "verbal or physical conduct of a sexual nature" that has "purpose or effect of unreasonably interfering with an individual's work performance by creating an intimidating, hostile, humiliating or sexually offensive work environment"); *Muzzy* v. *Cahillane Motors, Inc.*, 434 Mass. 409, 411 (2001). Because of our conclusion that Modern's response to the allegedly harassing conduct satisfied Modern's obligations under G. L. c. 151B, we need not address this alternative argument.

The MCAD guidelines on the subject of sexual harassment provide that an employer may, in some circumstances, be held liable for sexual harassment perpetrated by persons who are not employees of the employer. Massachusetts Commission Against Discrimination Guidelines: Sexual Harassment in the Workplace § III.C (2002) (MCAD Guidelines). Specifically, liability may be imposed where the employer knew or should have known of the harassing conduct but "failed to take prompt, effective and reasonable remedial action." *Id.* The MCAD Guidelines recognize that an employer may have less control over perpetrators who are not its own employees, and the factor of control is to be taken into consideration in determining whether the employer should be held liable: "The primary difference between employer liability for harassment perpetrated by co-workers and harassment committed by non-employees lies in the ability of the employer to control the conduct of the non-employees. The greater the employer's ability to control the non-employee's conduct, the more likely it will be found liable for that person's unlawful harassment." *Id.* Where the Legislature has expressly delegated to the MCAD the task of "formulat[ing] policies to effectuate the purposes" of G. L. c. 151B and given it authority to "adopt, promulgate, amend, and rescind rules and regulations" to implement the statute, G. L. c. 151B, §§ 2, 3 (5), we accord substantial deference to the MCAD's interpretive guidelines. See *Dahill* v. *Police Dep't of Boston*, 434 Mass. 233, 239 (2001), and cases cited. Here, the MCAD's interpretation is a reasonable one, whereas the interpretation proposed by Modern would seriously undermine the objective of eliminating sexual harassment in the workplace.

The MCAD's interpretation is also consistent with a considerable body of Federal precedent interpreting comparable provisions of Title VII of the Civil Rights Act of 1964.[14] Regulations of the Equal Employment Opportunity Commission (EEOC)

---

[14]Title VII makes it unlawful for "an employer" to engage in prohibited acts of discrimination (including discrimination in the "conditions" of employment), 42 U.S.C. § 2000e-2(a) (2000), and defines "employer" as a "person engaged in an industry affecting commerce" who employs the requisite number of employees "and any agent of such a person," 42 U.S.C. § 2000e(b) (2000).

interpreting Title VII recognize that an employer may be liable for sexual harassment perpetrated by third parties: "An employer may also be responsible for the acts of non-employees, with respect to sexual harassment of employees in the workplace, where the employer (or its agents or supervisory employees) knows or should have known of the conduct and fails to take immediate and appropriate corrective action. In reviewing these cases the Commission will consider the extent of the employer's control and any other legal responsibility which the employer may have with respect to the conduct of such non-employees." 29 C.F.R. § 1604.11(e) (2004). Although the EEOC's position is not entitled to any particular deference, see *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 536 & n.18 (2001), and cases cited, the EEOC regulation here is consistent with the interpretation adopted by the MCAD. Both the MCAD Guidelines and the EEOC's regulations articulate the position that, once the employer knows or should know of the harassment being perpetrated by others, the employer is under an obligation to take reasonable steps to cure that harassment, giving consideration to the extent of the employer's ability to control the conduct of the third-party perpetrator.

Numerous Federal courts, informed by the EEOC regulations on this issue, have held that an employer may be liable for sexual harassment perpetrated by persons who are not employees or agents of the employer.[15] See *Watson* v. *Blue Circle, Inc.*, 324 F.3d 1252, 1258 n.2 (11th Cir. 2003); *Little* v. *Windermere Relocation, Inc.*, 301 F.3d 958, 968 (9th Cir. 2002); *Turnbull* v. *Topeka State Hosp.*, 255 F.3d 1238, 1244 (10th Cir. 2001); *Lockard* v. *Pizza Hut, Inc.*, 162 F.3d 1062, 1073-1074 (10th Cir. 1998); *Rodriguez-Hernandez* v. *Miranda-Velez*, 132 F.3d 848,

---

[15]Again, although we are not bound by Federal precedent interpreting an analogous Federal statute, we may appropriately consider that precedent as useful guidance. See *College-Town, Div. of Interco, Inc.* v. *Massachusetts Comm'n Against Discrimination*, 400 Mass. 156, 162 n.3, 163-164 (1987), quoting *Massachusetts Elec. Co.* v. *Massachusetts Comm'n Against Discrimination*, 375 Mass. 160, 167 (1978). Although we have noted reasons why our interpretation of G. L. c. 151B will sometimes differ from the Federal courts' interpretation of Title VII, see *Cuddyer* v. *Stop & Shop Supermarket Co.*, 434 Mass. 521, 536 (2001), none of those reasons is applicable here.

854 (1st Cir. 1998); *Crist* v. *Focus Homes, Inc.*, 122 F.3d 1107, 1111-1112 (8th Cir. 1997); *Folkerson* v. *Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997).[16]

We thus conclude, consistent with the MCAD Guidelines, the EEOC regulations interpreting Title VII, and the vast body of precedent applying those regulations, that an employer may be held liable for failing to respond reasonably to acts of sexual harassment of which it is aware or reasonably should be aware, even though the harassing acts are perpetrated by someone who is not an agent or employee of the employer.

b. *Standard for imposing liability for harassment by a third party.* Under the MCAD Guidelines, and under comparable Federal precedent applying the EEOC regulations, an employer is not held strictly liable for sexual harassment perpetrated by nonemployees. The standard is one of reasonableness: did the employer take "prompt, effective and reasonable remedial action," MCAD Guidelines, *supra*, or "immediate and appropriate corrective action," 29 C.F.R. § 1604.11(e), once it realized or should have realized that one of its employees was being victimized by a third party's harassment? The standard imposed has been referred to as a "negligence" standard. See *Turnbull* v. *Topeka State Hosp.*, *supra*; *Lockard* v. *Pizza Hut, Inc.*, *supra* at 1074; *Mart* v. *Dr Pepper Co.*, 923 F. Supp. 1380, 1388 (D. Kan. 1996); *Woods-Pirozzi* v. *Nabisco Foods*, 290 N.J. Super. 252, 272 (App. Div. 1996). It imposes a duty "to take prompt action reasonably calculated to end the harassment and

---

[16]See also *Gliatta* v. *Tectum Inc.*, 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002); *Ligenza* v. *Genesis Health Ventures of Mass., Inc.*, 995 F. Supp. 226, 230 (D. Mass. 1998); Kudatzky *vs.* Galbreath Co., U.S. Dist. Ct., No. 96 Civ. A. 2693(HB) (S.D.N.Y. Sept. 23, 1997); *Jarman* v. *Northlake*, 950 F. Supp. 1375, 1378 (N.D. Ill. 1997); Sabo *vs.* LifeQuest, Inc., U.S. Dist. Ct., No. Civ. A. 95-3757 (E.D. Pa. Oct. 8, 1996); *Mart* v. *Dr Pepper Co.*, 923 F. Supp. 1380, 1388 (D. Kan. 1996); Hallberg *vs.* Eat'n Park, U.S. Dist. Ct., No. Civ. A. 94-1888 (W.D. Pa. Feb. 28, 1996); Menchaca *vs.* Rose Records, Inc., U.S. Dist. Ct., No. 94 C 1376 (N.D. Ill. April 3, 1995); *Powell* v. *Las Vegas Hilton Corp.*, 841 F. Supp. 1024, 1027-1028 (D. Nev. 1992); *Magnuson* v. *Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 512-513 (E.D. Va. 1992), aff'd 40 F.3d 1244 (4th Cir. 1994); *Sparks* v. *Regional Med. Ctr. Bd.*, 792 F. Supp. 735, 738 & n.1 (N.D. Ala. 1992).

The EEOC regulations have also been found persuasive by State courts. See *Costilla* v. *State*, 571 N.W.2d 587, 591-592 (Minn. App. 1997); *Woods-Pirozzi* v. *Nabisco Foods*, 290 N.J. Super. 252, 268-272 (App. Div. 1996).

reasonably likely to prevent the conduct from recurring." *Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 813 (7th Cir. 2001).

Under this standard, the fact that an employer's efforts do not actually succeed in stopping or preventing the harassment is not determinative. "We are not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed." *Id.* at 811, citing *McKenzie* v. *Illinois Dept. of Transp.*, 92 F.3d 473, 480 (7th Cir. 1996). Although the "promptness and effectiveness" of the employer's response are key considerations, "[i]t is not always possible for an employer to completely eliminate offensive behavior, and thus the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the 'remedial and preventative action was reasonably calculated to end the harassment.' " *Turnbull* v. *Topeka State Hosp.*, *supra* at 1245, quoting *Adler* v. *Wal-Mart Stores, Inc.*, 144 F.3d 664, 676 (10th Cir. 1998).

Nor is an employer required to take what would, with hindsight, be considered better or more effective measures. "[T]he inquiry is not whether [the employer's] response was the *best* course of action possible, but rather whether it was appropriate in light of all the circumstances" (emphasis in original). *Crist* v. *Focus Homes, Inc.*, *supra* at 1112 n.5. Thus, a plaintiff does not establish an employer's liability merely by showing that the employer "could have done more." *Berry* v. *Delta Airlines, Inc.*, *supra* at 813. Rather, the plaintiff must show "that the steps that [the employer] actually took were not reasonably likely to prevent the harassment from recurring." *Id.*

In the same vein, the employer is not required to respond with the precise remedy that the harassment victim wishes or asks for — the victim does not have a right to "dictate the remedy the employer chooses to stop the harassment." Hallberg *vs.* Eat'n Park, U.S. Dist. Ct., No. Civ. A. 94-1888 (W.D. Pa. Feb. 28, 1996). In that case, for example, the plaintiff, a waitress who had been sexually harassed by a customer, was of the view that the offending customer should have been banned from the premises immediately, whereas the employer's remedial action had consisted of warning the customer that any future complaint

of similar misconduct would result in his being barred from the restaurant. *Id.* Although the employer's response was not as forceful as what the employee wished, it satisfied the employer's obligation, as it was "reasonably calculated to stop the harassment." *Id.*, quoting *Saxton* v. *AT&T Co.*, 10 F.3d 526, 536 (7th Cir. 1993). Similarly, in *Gliatta* v. *Tectum Inc.*, 211 F. Supp. 2d 992, 1002 (S.D. Ohio 2002), the employee complained that her supervisor, who had been present when a nonemployee made explicit sexual comments, failed to say anything to the perpetrator on the spot. However, her employer took action a few days later, sending a letter to the perpetrator forbidding him from attending future events and thereby ensuring that he would have no further contact with the plaintiff. *Id.* Notwithstanding the employee's understandable disappointment that her supervisor had not reacted immediately to the inappropriate remarks, the employer's response satisfied the standard of "appropriate action." *Id.* Thus, the mere fact that the victim is not satisfied with the employer's response does not suffice to render that response unreasonable.

c. *Analysis of Modern's response to third-party harassment of the plaintiff.* Applying the above standards to the remedial steps taken by Modern, we conclude that, as a matter of law, they satisfied Modern's obligation to take prompt action that was reasonably calculated to end the harassment being perpetrated on Edmands. The MCAD's decision imposing liability on Modern erroneously held Modern to the equivalent of strict liability because its remedial actions were not entirely successful and because, in the MCAD's and the plaintiff's view, Modern could have taken other or additional steps faster than it did. As discussed above, criticism in the form of alternative or additional remedies that might have been pursued do not suffice to render Modern's remedial steps unreasonable. Instead, we must focus on the remedial steps Modern did undertake, and whether, in all the surrounding circumstances, those measures were reasonably calculated to end and deter any further harassment. Where, as here, the employer did take action in an attempt to remedy the harassment, the reasonableness of that remedial action can be determined as a matter of law. See, e.g., *Berry* v. *Delta Airlines, Inc., supra* at 813-814 (summary judg-

ment for employer on ground that corrective actions were "reasonable and adequate under the circumstances," even though employer "doubtless could have done more"); *Gliatta* v. *Tectum Inc.*, *supra* (summary judgment for employer that "took appropriate action"); *Mart* v. *Dr Pepper Co.*, *supra* at 1388 (summary judgment for employer that "took prompt, adequate and effective action to remedy the situation"); *Hallberg vs. Eat'n Park*, *supra* (summary judgment for employer that "took prompt action designed to stop the harassment"). See also *Folkerson* v. *Circus Circus Enters., Inc.*, 107 F.2d 754, 756 (9th Cir. 1997).[17] If Modern took such reasonable steps, it cannot be held liable.

Within two days of the initial incident, Edmands's foreman had succeeded in identifying one of the perpetrators — Roselli, the ironworker who had fastened the tie wire around the toilet facility — and in obtaining his apology. Thereafter, Modern's project manager asked both Mohawk and the ironworkers union to remove Roselli from the site. When that request was refused, Modern made arrangements to separate Roselli (and the other ironworkers) from Edmands for a period of at least several months, relocating his work and changing his shift. There can be no dispute that these methods were successful with respect to Roselli — following the original November 3, 1993, incident

---

[17]By contrast, a plaintiff's claim survives summary judgment where there is evidence that the employer took no remedial action whatsoever, see, e.g., *Little* v. *Windermere Relocation, Inc.*, 301 F.3d 958, 968-969 (9th Cir. 2002); *Powell* v. *Las Vegas Hilton Corp.*, 841 F. Supp. 1024, 1030 (D. Nev. 1992); *Magnuson* v. *Peak Tech. Servs., Inc.*, 808 F. Supp. 500, 512-513 (E.D. Va. 1992), aff'd 40 F.3d 1244 (4th Cir. 1994); or where there is protracted delay before taking any remedial action, see, e.g., *Jarman* v. *Northlake* 950 F. Supp. 1375, 1379 (N.D. Ill. 1997) (five-month delay before employer took any corrective measure); *Woods-Pirozzi* v. *Nabisco Foods*, 290 N.J. Super. 252, 272-273 (App. Div. 1996) (one-year delay before employer investigated harassment, followed by three-month delay before taking action against perpetrator). Where the employer has taken some remedial action in response to a third party's sexual harassment, the reasonableness of that response has raised a jury question where the harassment has been particularly severe or protracted. See, e.g., *Turnbull* v. *Topeka State Hosp.*, 255 F.3d 1238, 1242-1243, 1245 (10th Cir. 2001) (plaintiff raped by patient at mental hospital); *Crist* v. *Focus Homes, Inc.*, 122 F.3d 1107, 1108-1109 (8th Cir. 1997) (repeated sexual assaults and attempted rapes by program resident); *Costilla* v. *State*, 571 N.W.2d 587, 594 (Minn. App. 1997) (employee endured over two years of "relentless" harassment after belated commencement of remedial action).

up through Edmands's resignation the following May (a period of approximately seven months), there is no evidence that Roselli ever engaged in further harassment of Edmands (or of any other woman on the project site). That Edmands would have preferred never to encounter Roselli again at all, or, in the hearing commissioner's words, that Modern could have "taken more aggressive action to ensure [Edmands] would not encounter Roselli in the workplace," is not the issue.[18] The issue is whether Modern's actions were reasonably calculated to prevent Roselli from further harassing Edmands. They were, and as to Roselli, they were in fact completely successful.

Roselli's fellow perpetrators and, in particular, the ironworker who peered into the toilet facility while Edmands was inside, were never identified. The hearing commissioner faulted Modern for not having "thoroughly investigated" the original incident, suggesting that Modern should have "spoke[n] to employees who were in the vicinity." There is no dispute that Modern made efforts to uncover the identity of the various perpetrators, but those efforts were stymied by the fact that Edmands herself could not make any identification of the perpetrators (either from her recollection of the incident or from her

---

[18]The hearing commissioner's decision cites *Ellison* v. *Brady*, 924 F.2d 872, 883 & n.19 (9th Cir. 1991), for the proposition that Modern was obligated to insulate Edmands from any contact with Roselli. The court in *Ellison* opined that "*in some cases* the mere presence of an employee who has engaged in *particularly severe or pervasive* harassment can create a hostile working environment" (emphasis added). *Id.* In that case, the perpetrator repeatedly sought to engage the victim in unwanted social encounters and, when rebuffed, wrote her a series of "weird" notes and letters reflecting his obsessive infatuation with her and his mistaken belief that she had similar feelings for him. *Id.* at 873-875. Despite the severity of that harassment, the court held that it was an open question, to be addressed on remand, whether returning the perpetrator to the same office as the plaintiff after he had been removed for a "six-month cooling-off period" violated the employer's obligation to provide a reasonable remedy. *Id.* at 883. That case does not stand for, and we do not accept, the proposition that complete and permanent removal of the perpetrator is the sine qua non of reasonable remedial action. See *Berry* v. *Delta Airlines, Inc.*, 260 F.3d 803, 806, 813 (7th Cir. 2001) (reduction in amount of contact sufficient, even though plaintiff wanted complete separation from perpetrator). Indeed, in some circumstances, a mere warning to or reprimand of a third-party perpetrator can constitute reasonable remedial action. See *Mart* v. *Dr Pepper Co.*, 923 F. Supp. 1380, 1388-1389 (D. Kan. 1996); Hallberg *vs.* Eat'n Park, U.S. Dist. Ct. No. Civ. A. 94-1888 (W.D. Pa. Feb. 28, 1996).

review of the videotapes),[19] and that Mohawk, under apparent pressure from the ironworkers union, refused to investigate its own workers or supply information to Modern. Modern's project manager asked Mohawk to investigate, but received no cooperation. Efforts by Coblyn to speak with Mohawk employees and officials were also rebuffed.[20] Speculation that additional efforts to speak with unidentified "employees who were in the vicinity" might have yielded further information as to additional perpetrators does not operate to undermine the reasonableness of the investigative efforts that Modern made.

Moreover, the issue is not whether additional perpetrators could have been identified so that they could be dealt with individually. The issue is whether, lacking such identification when its investigation was blocked by the intransigence of Mohawk and the ironworkers' union, Modern made reasonable efforts to prevent further harassment. It did so. Modern's displeasure over and desire to remove the perpetrators of the tie wire and peeping incident was made known to Mohawk officials, to the ironworkers' union officials, and to Roselli. In addition, the relocation and rescheduling of the Mohawk work had the effect of removing *all* of the ironworkers — whether they had participated in the harassment or not — from Edmands's immediate work area, thus ensuring that her contact with the unidentified perpetrators would be minimized for a period of some months. Other than isolated incidents of graffiti (discussed *infra*), there was no form of sexual harassment perpetrated thereafter.[21]

The hearing commissioner also criticized Modern for making

---

[19]Nor did she supply any information as to potential witnesses who might be able to help.

[20]Edmands's own understanding of the situation was that Mohawk "wouldn't tell [Coblyn] anything," and that although the ironworkers knew who the perpetrator was, "they would never give up his name and that if they were put under too much pressure, that they would strike."

[21]Edmands provided no time frame with respect to the incident when ironworkers made noises near where she and another carpenter were working. See note 10, *supra.*

Nor would the isolated, and completely unrelated, comment of her supervisor at the mill (pertaining to the economic impact of women in the work force) constitute sexual harassment. By that time, Edmands had been relocated to a work site totally removed from the scene and the offending perpetrators

only "limited efforts" to provide security for the women's toilet facilities — e.g., the belated installation of fencing.[22] However, the undisputed fact is that a variety of security precautions were taken, culminating ultimately in the assignment of a monitor to address any and all issues pertaining to the toilet facilities. That the hearing commissioner thought that these measures should have been implemented sooner or more aggressively does not undermine the reasonableness of Modern's response. In fact, after the sole incident involving Edmands on November 3, 1993, there was no evidence that any other female was accosted, spied on, locked in, or otherwise harassed while using the women's toilet facilities. Modern's actions with respect to those facilities were apparently adequate. And, as to Edmands herself, she continued to use other toilet facilities, even after Modern implemented every security measure suggested. The presence or absence of any particular measure, or the timing of its implementation, was of no practical consequence to Edmands.

The hearing commissioner also found inadequate Modern's steps with respect to three incidents of graffiti at the site, one such incident occurring on November 10, 1993; the next on March 21, 1994; and the last in early April, 1994. Although noting that "it is difficult for an employer to fully prevent graffiti, which is typically created both anonymously and surreptitiously," he again opined that Modern somehow "could have more thoroughly investigated" these incidents of graffiti, without indicating what could realistically be done to identify

---

involved in her earlier harassment. The comment of her new supervisor was not a continuation of the harassment previously perpetrated by the ironworkers.

[22]The hearing commissioner also faulted Modern for the fact that the padlocks it installed on the women's toilet facilities were "soon missing." There is no evidence to suggest that either Modern officials or intended perpetrators of sexual harassment removed the padlocks. To the contrary, where the only people who were issued keys to those padlocks were the women employees, it would appear most likely that the women removed them — they presumably found these locks unnecessary or more of an inconvenience than they were worth. Edmands's one incident notwithstanding, there is no evidence to suggest that the female workers thought that the toilet facilities lacked adequate security. There were apparently some complaints about cleanliness, but cleanliness of the site's portable toilet facilities has nothing to do with sexual harassment.

the anonymous and surreptitious perpetrator or perpetrators.[23] He then criticized Modern's response to this graffiti, expressing the view that Modern should have sent around Coblyn's draft notice condemning "sexual harassment" instead of a warning notice focused "exclusively on graffiti in the workplace." When the only form of sexual harassment that was then being perpetrated took the form of vulgar and sexually explicit graffiti, reasonable minds could differ about whether a warning notice complaining of "vulgar, obscene messages" and prohibiting "[o]ffensive statements, whether written or verbal" anywhere on the work site would be more effective than a warning concerning "sexual harassment" in general. See notes 11 and 12, supra. If the purpose is to deter offensive graffiti, a notice prohibiting offensive graffiti is at least "reasonably calculated" to deter it. Indeed, from Coblyn's proposed notice prohibiting "sexual harassment" or "any form of discrimination, coercion, intimi[d]ation or any manifestation that interfer[e]s" with another's ability to perform the job, recipients would not necessarily appreciate that graffiti in places that the women workers would not see was a form of "sexual harassment" or "discrimination." We see nothing unreasonable in Modern's decision to send a pointed, as opposed to ambiguous, message on the subject of offensive graffiti.

Finally, the hearing commissioner criticized Modern for not engaging in more thorough and widespread educational efforts to instruct all workers on site about sexual harassment. Of course, on the record presented below, there was no evidence that sexual harassment was a widespread phenomenon among the multiple subcontractors and hundreds of tradespeople working at the site — Edmands's problems stemmed exclusively from interactions with ironworkers, not from Modern employees or the employees of other subcontractors. Modern's displeasure over the conduct of those ironworkers was made known to their

---

[23]Where the graffiti itself contained some reference to the original incident in which Edmands was trapped and spied on while using the toilet, it would be reasonable to suspect that the same culprits were behind the graffiti. Other than the fact that the original perpetrators were ironworkers, and that the graffiti artists were also likely to be the same ironworkers or their cohorts, Modern had no ability to identify the particular ironworkers responsible for either form of harassment.

employer, Mohawk, and to their union. It was not unreasonable for Modern to expect that Mohawk (and the union) would communicate that displeasure to their own employees and undertake efforts at education. And, whatever the attendance figures at Modern's own "tool box talks," Coblyn gave repeated presentations on the subject of sexual harassment at those sessions. One can always conduct longer, more in-depth instruction to sensitize workers to the problem of sexual harassment, and one can always do more to ensure that every single worker attends such instructional sessions. That does not mean that Modern's educational efforts, in combination with its other remedial efforts, were so insufficient as to signal that it "ratified or acquiesced in" the harassment perpetrated upon Edmands. *Folkerson* v. *Circus Circus Enters., Inc.*, 107 F.3d 754, 756 (9th Cir. 1997).

The hearing commissioner's decision also fails to take into account, or even to mention, the critical issue: whether Modern had the ability to "control" the persons perpetrating the harassment of Edmands. The MCAD Guidelines, the EEOC regulations, and the many cases applying those regulations recognize that the ability to "control" the third party perpetrator is a key factor in determining an employer's liability for sexual harassment perpetrated by that third party. Where, for example, the perpetrator is a client or customer, the employer often retains a considerable degree of control, as the employer may set the terms on which it is willing to do business with that client or customer. See, e.g., *Lockard* v. *Pizza Hut, Inc.*, 162 F.3d 1062, 1066 (10th Cir. 1998) (company manual recommended that managers deal with offending customers by "asking the customer to refrain from the conduct and if the customer persists, asking the customer to leave the restaurant"); Kudatzky *vs.* Galbreath Co., U.S. Dist. Ct., No. 96 Civ. 2693 (HB) (S.D.N.Y. Sept. 23, 1997).

Here, Modern was not dealing with a customer or a client, but with a subcontractor's employees. The hearing commissioner assumed that Modern could have "taken action against a subcontractor whose workers refused to comply with the [C]ommonwealth's laws against workplace harassment." However, the record does not contain a copy of Modern's contract with Mo-

hawk, and there is no basis for assuming that the single incident involving the portable toilet, for which Mohawk's workers were responsible, or subsequent incidents of graffiti, which were probably (but not definitively) authored by Mohawk workers, would have allowed Modern to take any particular "action against" Mohawk. More importantly, making the extreme assumption that these infractions committed by Mohawk workers would have justified the termination of Modern's contract with Mohawk (a conclusion that cannot be drawn on this record), even that drastic action would not have removed the offending ironworkers from the site. Pursuant to the project labor agreement (PLA), the ironworkers for the project had to be hired through the union's hiring hall, and any successor to Mohawk would have been sent the same crew of ironworkers.

Similarly, Mohawk's own ability to remove the perpetrators from the site was limited by the PLA. Under the PLA, a trade union worker, such as Roselli, could only be terminated for "just cause." Roselli's involvement in a single incident of harassment, for which he had apologized, followed by no further infraction, would not appear to be "just cause" justifying his termination. The union had made clear that it would pursue grievance and arbitration — and had threatened to strike — in the event that any form of discipline was imposed on Roselli. Effectively powerless to impose meaningful discipline on Roselli, Mohawk had even less power to discipline any additional suspected but unidentified perpetrators. The hearing commissioner's assumption that Modern somehow had the ability to force Mohawk to take such steps is not supported on this record. Given that the employer's ability to control the perpetrator is a critical factor for the imposition of liability, that ability to control must be demonstrated on the record, not assumed.

In short, lacking any evidence of the key element of "control" over the third-party perpetrators, we should be particularly wary of imposing liability on Modern for the misdeeds of Mohawk's employees. There is nothing here to suggest that Modern encouraged the harassment perpetrated on Edmands, that it tacitly condoned it, or that it acquiesced in it. It took various measures to combat the harassment, which were, despite its lack of "control," largely successful. That it could

not entirely stomp out occasional incidents of graffiti — the only form of harassment that persisted after the original incident — does not operate to make it liable.

We recognize the MCAD's desire to take a strong stand to protect women working in the traditionally male-dominated construction trades. Its decision that Modern did not do enough in response to Edmands's complaint, and its sweeping remedial order requiring Modern to undertake a multi-year discrimination and sexual harassment training program for all of its employees, reflects that laudable desire. However, the issue here is not whether Modern responded to Edmands's complaint in ways that the MCAD would prefer, or whether its response was as emphatic and prompt as might be ideal. The issue is whether it took steps reasonably calculated to stop the harassment and prevent recurrence of the harassment, with the reasonableness of those steps considered in light of its practical ability to control the actual perpetrators. The obligation to make reasonable efforts cannot be transformed into an obligation to make maximum efforts. That Modern was not completely successful in eradicating all remaining vestiges of sexual harassment (i.e., occasional graffiti), and that one can envision additional steps that might have been taken (still with no guarantee of success), does not suffice to impose liability on Modern. Where the employer satisfied the threshold requirement of reasonableness, the MCAD cannot demand more.

*Judgment reversed.*