# United States Court of Appeals
## For the First Circuit

No. 22-1175

SARA CARUSO,

Plaintiff, Appellant,

v.

DELTA AIR LINES, INC.,

Defendant, Appellee.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Gelpí, Lynch, and Thompson,
Circuit Judges.

Eric R. LeBlanc, with whom Michaela C. May and Bennett & Belfort, P.C. were on brief, for appellant.
Lisa Stephanian Burton, with whom Patrick M. Curran, Jr., Lorenzo R. Cabantog, and Ogletree, Deakins, Nash, Smoak & Stewart, P.C. were on brief, for appellee.

August 21, 2024

**LYNCH**, **Circuit Judge**.  Appellant Sara Caruso, then a flight attendant with appellee Delta Air Lines, Inc., failed a breathalyzer test when she reported for work on the morning of August 4, 2018, after a layover in Dallas, Texas.  Caruso believes she was drugged and sexually assaulted by Delta First Officer James Lucas on the night of August 3-4, 2018.  The Dallas Police Department concluded there was insufficient evidence to support that an offense occurred.  After conducting its own investigation, Delta also took no action against Lucas.  Caruso completed an alcohol rehabilitation program as recommended by a Department of Transportation ("DOT") psychologist and then sought accommodations from Delta for post-traumatic stress disorder ("PTSD") arising from the alleged assault.  Caruso and Delta initially reached agreement on a set of accommodations and Caruso returned to work for just over a month before abruptly reversing course and resigning.

Caruso brought a lawsuit against Delta in Massachusetts state court, later removed to the U.S. District Court for the District of Massachusetts, alleging Delta violated Massachusetts General Laws chapter 151B; Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e; and the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12112, 12203.  The district court granted summary judgment for Delta on all counts.  Caruso v. Delta Air Lines, Inc., No. 20-10180, 2022 WL 715709 (D. Mass. Mar.

9, 2022).  We affirm entry against all of her claims.  Title VII and General Laws chapter 151B, while not identical, require dismissal of a claim where, as here, there is no causal connection between Delta's actions and the alleged harassment and Delta responded reasonably to the alleged harassment.  Caruso's disability discrimination claims under both the ADA and chapter 151B fail because she did not engage in an interactive process in good faith with Delta to develop reasonable accommodations.

## I.    Background

"We recount the facts 'in a light as favorable to [Caruso] as the record will reasonably allow.'"  Sarkisian v. Austin Preparatory Sch., 85 F.4th 670, 671-72 (1st Cir. 2023) (quoting Travers v. Flight Servs. & Sys., Inc., 737 F.3d 144, 145 (1st Cir. 2013)).  Under both Title VII and Massachusetts General Laws chapter 151B, Caruso's claims fail if she cannot show the alleged harassment is causally connected to Delta's actions.  She has not shown any causal connection.  See Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005); Forsythe v. Wayfair Inc., 27 F.4th 67, 72 (1st Cir. 2022).  Further, Delta's actions under the law may be reviewed only for reasonableness.  And Caruso has not shown Delta's actions were unreasonable, much less that they were causally connected to any harm inflicted on her by a co-worker.  See Forsythe, 27 F.4th at 74.

Delta hired Caruso as a flight attendant in March of 2016. Caruso's home base was Boston Logan International Airport, and her duties frequently took her to other cities where sometimes overnight stays were required.

a. Events of August 3-4, 2018

On August 3, 2018, Caruso worked as a flight attendant on flight 1171 from Atlanta to Dallas alongside flight attendants Emma Brown, Ashley Wells, and Victoria Mercer; First Officer James Lucas; and Captain Randall McCormick. Lucas and Caruso did not know and had never interacted with each other before this flight. The crew arrived in Dallas in the early afternoon and traveled by private shuttle to the Hyatt Regency hotel in downtown Dallas for an overnight layover before their scheduled pick up at 5:30 am the next day to work additional flights.

Caruso, Brown, Mercer, and Lucas made plans to meet in the hotel lobby at 4:00 pm that day "to go out" in Deep Ellum, Dallas's arts district. The group traveled together by Uber to a restaurant in Deep Ellum, where the group ate dinner and began drinking. At roughly 6:00 pm, the group walked "several blocks" from the restaurant to a Deep Ellum bar, and then at 8:00 pm to another bar. Caruso testified that she had three to four gin and tonics and one tequila shot over the course of the night.

Just before 9:00 pm, Brown "passed out" at the final bar and "the bartender told [the group] to take her home." Lucas

- 4 -

called an Uber for the group and they arrived back at the hotel around 9:00 pm. The group boarded the elevator together, and Mercer got off on the seventeenth floor, leaving Caruso, Brown, and Lucas on the elevator. Lucas and Caruso took Brown to Brown's room.

It is undisputed that Caruso states she has no memory of anything that happened between leaving Brown at her room just after 9:00 pm and waking up the following morning. Caruso stated that she "struggle[s] to sleep" and had recently "started . . . a new medication to help with the problem but [she] can't remember anything after [she] take[s] it" in an August 4, 2018, email to her Delta supervisor, Amy Broach.

Lucas stated in an August 9, 2018, statement that the group

> "returned to the hotel at approximately 9:00 pm. One of the flight attendants (Victoria [Mercer]) got off the elevator. The third flight attendant (Sara [Caruso]) and I walked the second flight attendant (Emma [Brown]) to her room and then decided to hang out and talk for a while. I later went to my room and had no further interaction with any of the flight attendants that evening."

Lucas testified at a deposition on May 14, 2021, after Caruso had filed this lawsuit alleging sexual assault, that he and Caruso left Brown's room "laughing and talking" and, sometime between 9:30 and 10:00 pm, walked together to Caruso's room, which was on the same floor as Brown's room. Caruso opened the door

with her room key and Lucas followed her in, "continuing" their "conversation and laughing about who knows what." Lucas testified that he "sat down on the foot of [Caruso's] bed and [Caruso] stood at the front of the room" while the two "continued talking and laughing." Lucas did not consume any additional alcohol nor did he see Caruso do so.

Lucas testified that after some time Caruso "pushed [him] down" and the two "started kissing." Lucas testified that he and Caruso engaged in oral and other sexual acts but not penetrative sex and that Caruso did not appear intoxicated to him at that time. Lucas testified that during these acts Caruso asked him to engage in penetrative sex with her. Lucas testified that when he told Caruso he did not have a condom with him in the room she said, "Well, I am not gonna have sex with you without a condom." Lucas then decided "to go back to [his] room and retrieve a condom." When he left Caruso's room he took Caruso's room key with him so that he "could let [him]self back in."

Lucas testified that he returned to his room, retrieved a condom, and used the bathroom. When Lucas returned to Caruso's room ten to twenty minutes later he found her naked "sitting in the shower basin with the water running over her." Lucas testified that Caruso "appeared intoxicated at this point, so [he] felt like [he] wanted to get her dried off, put her into bed and then call it a night." Lucas dried her off and attempted "to put her under

the sheets so she could go to bed." While Lucas was attempting to move Caruso to the bed she "threw up mostly off the side of the bed, but it also caught a little bit of her arm." Lucas then "helped her to her feet [and] walked her back to the bathroom, turned on the shower, and put her back in the shower" where Caruso "stood in the shower under her own power and she rinsed off." Lucas then dried Caruso off again and placed her back in the bed.

Lucas testified that once Caruso was back in bed she asked him to retrieve her panties from the floor, which he did, and that Caruso then asked him to retrieve her medications from her suitcase, which he also did. Lucas testified that, when he saw that one of the medications Caruso was preparing to take was Ambien, he told her, "Hey, don't take the Ambien. I don't think you'll wake up," and that he did not see her take that medication.

Lucas testified that he turned off the lights and returned to his room. Lucas testified he remembered that by the time he returned to his room and prepared himself for bed he "look[ed] at the clock and [was] happy that it had not reached midnight, so [he]'d be able to get some sleep."

At 12:20 am Dallas time on August 4, 2018 -- roughly thirty minutes after Lucas testified he had returned to his room -- Caruso called Delta's Operations Control Center ("OCC"). The OCC's documentation from that call states that Caruso "request[ed] [First Officer] Lucas's phone number" and that Caruso "was unable

to explain why she needed Lucas'[s] phone number besides the fact that he said he was going to 'hang out'" and that Caruso stated "Victoria [Mercer] and Emma [Brown] were also with her at the hotel at that time." When the operator asked Caruso "if she had an emergency, she said no, and that they just wanted to hang out." The document states Caruso was "repetitive and incoherent, speaking with slurred speech."[1]

Caruso also sent two text messages to Brown at 12:09 am on August 4 which read "Where is my sit" and "Bang band pang," respectively. These text messages were submitted by Delta after being produced from Caruso.

Brown testified that after she awoke the next morning and went to the front desk, a hotel employee told her that Caruso had been "running around in her bra and underwear banging on people's doors yelling for [Lucas] and [Brown], so security was called." The hotel also called Delta overnight to report as much. The evidence as to Caruso's call, her text messages, and the hotel's report does not conflict with Lucas's timeline of the night.

In response to Caruso's call to the OCC, Delta "contacted the Substance Testing hotline" based on reasonable suspicion that

---

[1] By all accounts, Caruso did not call to report a sexual assault to Delta (or any other emergency) and simply expressed to Delta that she wanted to "hang out" with Lucas.

- 8 -

Caruso and her crewmates had been using alcohol in violation of Delta policy. Delta arranged for a supervisor to intercept the group at the Dallas airport the next morning to examine them for possible testing. Delta also mobilized replacement flight attendants to provide coverage in the event Brown, Mercer, or Caruso needed to be pulled from their scheduled flights.

Caruso and her crewmates knew the schedule was for them to be picked up by shuttle from the Hyatt Regency at 5:30 am on August 4 to work their next flight. Caruso was the only crew member who did not report to the lobby at the scheduled time. Brown asked the front desk for access to Caruso's room to check on her, at which point the employee at the front desk described Caruso's behavior which led to hotel security being called.

Two hotel security guards took Brown to Caruso's hotel room door, where Caruso, not fully dressed, answered the door. Brown testified that Caruso's "luggage was a mess. She had her stuff laying on the ground all around her bag, very disorganized. That's pretty much it."[2] Brown testified that Caruso "was in her bra and underwear. She looked like she had a long night. Her hair was kind of messy. Her eyes were very glassy and very

---

[2] This description matches Caruso's description of her room in her later statement to Delta. "[M]y room was a mess," Caruso wrote, "and my suitcase had been thrown across the room."

bloodshot" and that "[t]he only thing she was concerned about was being late to work."

Brown and Caruso eventually joined the rest of the crew in the lobby and the group traveled to the Dallas airport via the planned shuttle. Delta Station Manager Hal Hayes met Caruso, Brown, and Mercer at the airport and interviewed each separately to evaluate Delta's suspicion of a violation of Delta and DOT alcohol use policies and regulations. Hayes concluded based on his assessment of Caruso as having "red eyes," "[g]lassy eyes," and "[d]rowsiness" that Caruso "warrant[ed] testing," to which Caruso consented. A third party technician performed an initial and a confirmatory breathalyzer test on Caruso, each of which registered a blood alcohol content of 0.079, roughly four times Delta's policy threshold of 0.020 and double the federal maximum of 0.040.[3] See 14 C.F.R. § 91.17(a)(4). Caruso was immediately removed from duty, asked to change out of her uniform and hand in her ID badge, and sent home to Boston on a flight later that day.

b.    Delta begins investigating Caruso's alcohol use

Delta Field Service Manager Amy Broach, Caruso's direct supervisor in Boston, asked her on August 4 for a "detailed statement from when [the crew] arrived [at the Dallas hotel] until they returned back to the hotel so [Delta] could gather the facts

---

[3] Caruso also submitted to a drug test at the same time, which she passed.

to determine what happened" with respect to Caruso's failed alcohol test. Caruso supplied a statement later that day. In her statement Caruso asserted she had had two gin and tonics, one French 75 cocktail, and a tequila shot, then returned to the hotel, went to her room, took her medications, and went to bed. She stated she "ha[d] no recollection of making any phone call[]" to the OCC "or doing anything after having gone to bed" such as leaving her hotel room, banging on hotel doors, or interacting with hotel security during the night. Caruso's statement also listed ten prescription medications she takes. Caruso made no allegations of sexual assault in this statement and referred to Lucas only as "a pilot" who was a member of their group that evening.

The same day, August 4, 2018, Delta suspended Caruso pending further investigation, evaluation, and potential treatment.

Mercer, Brown, and Lucas each gave a statement to Delta in the following days. Mercer's and Lucas's statements, like Caruso's initial statement, focused on the group's activities at the various Dallas bars they had visited. Mercer's statement referred to an "FO James," and she noted in an email that "James" told her that he had "walked the girls ([Caruso and Brown]) to their individual rooms" when they got back. On August 8, Broach reported to other Delta officials that Brown told her "yes F/O

Lucas escorted them to their rooms," going to Brown's room "first" and then to Caruso's. As described, Lucas's August 9 statement, requested by Delta, stated that after returning to the hotel he and Caruso "decided to hang out and talk for a while" and that he "later went to [his] room and had no further interaction with any of the flight attendants that evening."

        c.    Caruso's actions immediately following suspension

On August 4, after learning she had been suspended and without informing Delta, Caruso went to Beth Israel Deaconess Hospital in Plymouth, Massachusetts, to "complete a sexual assault kit." In that exam report, Caruso is recorded as "unsure" as to the time of assault, number and identity of assailants, use of any weapons, and all details of any purported sexual acts. Caruso's physical exam was unremarkable except for a bruise on her right hip, pain to her chin area, and petechiae -- small red spots -- around her eyes. Despite options to check "no" on the exam report for whether the "assailant(s) attempt[ed] to strangle patient," the examiner checked "unsure" and wrote on the blank link following "[i]f yes, describe," that "patient had petechiae around eyes." The physical exam of Caruso's genitalia and anus in particular was within normal limits. The kit also included the collection of swabs, head hair combings, fingernail scrapings, clothing, and samples of Caruso's blood and urine, for laboratory testing.

On the morning of August 5, Caruso emailed Broach an "[a]dditional statement" in which she stated for the first time that she thought she was "potentially drugged and assaulted" at the Dallas hotel. She stated she had completed a sexual assault kit at the local hospital and that the kit was "being sent to Mass state police to b[e] transferred to Texas." Caruso told Broach that she had "petechia in my eyes that was indicative of attempted strangulation" and later texted Broach that "they gave me prophylactic antibiotics against stds, emergency contraceptive and started me on HIV medication[.]" Caruso did not at this time identify Lucas or anyone else as the individual she believed had "potentially" drugged and assaulted her.

Caruso did not file a police report with either the Dallas or Massachusetts authorities at that time, nor did she tell Delta she had not done so.

d.  Delta incorporates Caruso's concerns about possible sexual assault into its investigation

On August 7, 2018, in response to Caruso's August 5 allegation that she may have been sexually assaulted by an unidentified individual, Delta Corporate Security requested hotel key card swipe data for Caruso's room and any available video footage of anyone coming in and out of her room from the Dallas hotel.

Also on August 7, 2018, Caruso met with a DOT psychologist, Dr. John Murray, as arranged by Delta and pursuant to corporate policy in response to a positive alcohol test, for an evaluation of her mental state and potential substance abuse disorder related to alcohol. On August 10, Dr. Murray told Caruso that he was recommending she complete a thirty-day residential rehabilitation program. Caruso agreed and arranged to report to Cornerstone of Recovery in Tennessee for admission on August 20, 2018.

In the afternoon on Thursday, August 16, Delta learned that a police report was necessary to access hotel video and key swipe files. Delta believed that Caruso "had already filed a police report," as a Delta corporate representative testified, "based on" Caruso's statement "that when she went and had her sexual assault kit completed, . . . she shared with [Delta] that she was having that transferred from Massachusetts to Texas."

The following Monday, August 20, Caruso reported for admission to Cornerstone. Cornerstone diagnosed Caruso with "[a]lcohol use, unspecified with unspecified alcohol-induced disorder." Delta's corporate representation testified that from that point on to have any further "discussion[s] with [Caruso], [Delta] had to wait until she returned from treatment."

e. <u>Caruso files a Massachusetts police report, Massachusetts police contact Dallas police, and Dallas police eventually inform Delta that Lucas is a suspect before concluding there is no evidence an offense occurred</u>

Caruso was discharged from Cornerstone on September 24, 2018. Caruso filed her first police report related to the alleged sexual assault with the Middleboro Police Department in Massachusetts[4] two days later on September 26.

Caruso claims that she was unable to file a police report from her inpatient rehabilitation program at Cornerstone. However, Caruso did not report to the Cornerstone program until August 20 and does not allege that she was unable to file during the sixteen days between the alleged assault and her arrival at the program. The record further indicates that, once admitted to Cornerstone, Caruso had at least some access to her phone and used it to contact outside individuals including Broach at Delta and her father, whom she requested hire her an attorney. Indeed, when Caruso told her Cornerstone counselors that she believed she had been sexually assaulted in Dallas, those counselors offered to help her file a police report. She did not accept that offer.

---

[4] This police report states that Caruso "attempted to report the sexual assault with the Dallas Police Department. Dallas PD told [Caruso] to the [sic] report the incident with a local police department and then have them contact the Dallas [police]." There is no evidence in the record of when this interaction between Caruso and the Dallas police occurred.

- 15 -

Caruso filed the September 26 police report with Detective Alan Cunningham of the Middleboro Police Department in Massachusetts. As in her other narratives up to this point, Caruso did not identify any particular individual as the person she believed assaulted her. The report states that when Det. Cunningham asked why Caruso would have been tested for alcohol immediately upon arriving at the Dallas airport, Caruso stated that "Delta Airlines received a call from the Hyatt Regency hotel reporting th[at] [Caruso] was walking around the halls in her underwear and talking incoherently around 1am." The record does not establish that Caruso disclosed her own phone call to Delta OCC to the police. When Det. Cunningham asked why it had taken Caruso almost two months to file this police report, Caruso "explained that she had been in a rehabilitation facility" since August 20, but did not address the two-week period between the alleged assault and her admission to that facility, her access to communication with the outside world, or Cornerstone's offer to help her report her allegations. Det. Cunningham transmitted the report to the Dallas Police Department.

On October 1, 2018, Detective Chris Anderson of the Dallas Police Department contacted Hyatt personnel to request any video related to Caruso's allegations. Det. Anderson learned that the video was unavailable as the hotel's systems automatically overwrote files after twenty to twenty-five days in the normal

course, meaning video of that night would have been deleted some time between August 24 and 29, 2018.[5] Det. Anderson shared this information with Delta Corporate Security on October 3, 2018, the first time Delta learned of it. No key card swipe data was obtained.

On October 3, Det. Anderson told Delta that the Dallas police were investigating Lucas in connection with Caruso's allegations. Delta cooperated with Det. Anderson's investigation. That day, Lance Mack of Delta Corporate Security sent to Det. Anderson Lucas's official statement of August 9 as well as contact information for Delta's Chief Pilot, Wayne Cochran, through whom Det. Anderson could contact Lucas. On October 12, Det. Anderson contacted Cochran, who agreed to reach out to Lucas and have him contact Det. Anderson. On October 17, Det. Anderson made contact with Lucas, who "asked to consult legal counsel before giving a statement." Det. Anderson told Delta on the same day that Lucas "[was] cooperating." Mack followed up with Det. Anderson again on December 19.

As best we can tell from the record, the Dallas police did not receive any of the materials from Caruso's August 4 sexual

---

[5] Hyatt personnel also agreed in response to Det. Anderson's email to attempt to locate the security guards who interacted with Caruso on the night in question, but responded that "there [wa]s no incident report that has any employee names." Nothing in the record suggests that anything came of this attempt.

assault kit, nor did the samples in that kit undergo any testing, until Det. Anderson began investigating in October 2018. Det. Anderson received serology results from Caruso's sexual assault kit swabs on January 3, 2019, and toxicology results from her blood and urine samples on January 7. All swab samples tested negative for seminal fluid and identified only trace evidence of "[a]pparent hair," "[a]pparent fibers," and "[d]ebris." Based on those preliminary results the forensic lab concluded that "no DNA testing [wa]s warranted." Caruso's blood and urine samples tested positive for only two substances other than her prescription medications: diphenhydramine (Benadryl) and a "[p]ossible" positive result for adrafinil, a stimulant.

On January 7, Det. Anderson concluded there was "no evidence to support that an offense occurred" and closed the case. The same day, Det. Anderson shared the conclusion that "[t]here is insufficient evidence to support criminal charges being filed in this case" with Delta corporate security. Det. Anderson told Delta in the same email that "Mr. Lucas did not cooperate with the investigation." The record does not establish that Delta had previously been informed that Mr. Lucas was "not cooperat[ing]," and suggests that the last that Delta heard of Lucas's involvement with the investigation was Det. Anderson's October 17, 2018 statement that "[Lucas] [was] cooperating." Delta inquired as to,

but Det. Anderson did not send, the results of Caruso's sexual assault kit testing.

> f. <u>Delta continues to investigate even after Dallas police inform Delta they are closing their investigation; Caruso files a discrimination complaint</u>

On December 18, 2018, Caruso filed a complaint with the Massachusetts Commission Against Discrimination ("MCAD") alleging several counts of retaliation and discrimination in violation of Title VII and Massachusetts General Laws chapter 151B against Delta and Broach.

Three Delta employees including Chief Pilot Bryan Dickerson and Senior Human Resources Manager Nicole Bell interviewed Lucas in response to this complaint on April 3, 2019. Lucas's union representative accompanied Lucas pursuant to Delta's collective bargaining agreement with its pilots. Dickerson's notes from this interview record Lucas as stating he and Caruso "kissed and touched, there was no intercourse. Everything [they] did was consensual." Consistent with Lucas's deposition testimony in this case, albeit providing less detail, Lucas stated:

> I left twice. We had physical interaction, she wanted to have sex but I didn't have a condom. I decided to go get a condom. Was gone for 15-20 minutes. When I came back, she was in bathroom, in the shower sitting with water coming down on her. I decided she was too intoxicated. Helped her into bed. When I left, she was in bed topless, in panties. The last time I left was around midnight.

- 19 -

Dickerson and Delta's corporate representative both testified that they found Lucas's interview statements "credible." Given the information it had obtained through its investigation up to that point, Delta declined to conduct any further investigation.

g. Caruso negotiates her return to work and then resigns

Caruso was on leave in various forms between August 4, 2018, and June 2, 2019, and did not have any contact with Lucas nor did she work any flights during this time. On February 4, 2019, Caruso, through counsel, requested disability accommodations from Delta for PTSD arising from her belief that she was drugged and sexually assaulted on the night of August 3-4, 2018. Caruso requested, as later clarified and documented with Caruso's healthcare provider, four principal accommodations: (1) reassignment to a new supervisor; (2) to not work on the same flight as Lucas; (3) to not be in enclosed spaces with Lucas; and (4) to have the ability to remove herself from situations in which Lucas was present such as, for example, the ability to change her layover hotel or transportation method if necessary to avoid Lucas.

Delta and Caruso engaged in an interactive process by phone on May 21, 2019, to determine the feasibility of her requested accommodations should she resume her duties. During that phone call, Delta told Caruso that it would reassign her to

a new supervisor.  Delta told Caruso that its scheduling system was not capable of ensuring two specific employees never encountered one another and thus that it could not grant Caruso her other requested accommodations.  Instead, Delta recommended that Caruso "bid on flights that [Lucas] is not certified to fly" and provided her with Lucas's current certification information.  Delta further recommended that she attempt to trade any flights she was scheduled to fly with Lucas and stated that she "could change [her layover] hotels or utilize different transportation" if necessary to avoid Lucas "but Delta would not automatically assume responsibility for th[ose] cost[s]" and instead would "review[] [them] on a case-by-case basis."  Delta also told Caruso that it "would be happy to reevaluate [her] request, and [engage in] another interactive accommodation discussion" "[s]hould circumstances change."

Caruso accepted these proposed accommodations in an email to Delta personnel on May 22, 2019, and returned to work on June 2, 2019, under her new supervisor, Courtney Roosevelt.  At no time did she encounter Lucas after the night of August 3-4, 2018.

On June 8, 2019, after having worked seven flights under this accommodation structure without incident, Caruso was scheduled to work flights that included a layover hotel stay in Dallas at the same Hyatt Regency hotel.  When she expressed concerns to the supervisor on site, Brian LaPlante, he offered her

the option "to make alternate hotel arrangements for herself at another hotel" in Dallas but "she did[] not want to do that." LaPlante observed that Caruso "was having difficulty breathing and communicating, and therefore [he] made the decision to remove her from the trip" she was scheduled to work.

Caruso worked two further flights, one on each of June 9 and 10. Caruso's June 10 flight was the last flight listed in the record she worked as a Delta employee.

At some point between June 10 and June 16, Caruso was "admitted to [a] specialty hospital" due to a "suicide attempt." On June 16 Caruso requested from Delta a "hardship transfer" to Salt Lake City, where her parents lived, "to have [her] family support [her] mental health and have easier access to [her] psychiatrist and psychotherapist." Caruso submitted the completed paperwork for this request on June 27, and Delta approved it on July 4, 2019.

On July 22, 2019, Caruso completed paperwork related to a "conditional offer of employment" she had received to work as a dispatcher with Salt Lake Valley Emergency Communications Center with an expected hire date of July 29, 2019. In that paperwork, Caruso listed July 26, 2019, as her final day of employment with Delta.

On July 24, 2019, two days after Caruso had completed paperwork for this new job, Caruso's attorney sent a letter to

Delta demanding "Delta's wholesale reversal and its unequivocal grant of the accommodations [Caruso] sought, in full" by "Friday, July 26, 2019," or else "Caruso w[ould] be considered constructively discharged." Caruso's letter attached a second MCAD complaint which added an allegation that, on the basis of Delta's discrimination and failure to provide reasonable accommodations, Caruso had been constructively discharged.

On July 26, Delta requested an extension of Caruso's forty-eight-hour deadline for Delta to respond to her demand for a revision of her accommodations plan. Caruso declined. July 31, 2019, Caruso emailed Roosevelt to ask where she should send her ID and equipment "since [she] resigned as of July of [sic] 26th." Roosevelt responded that "this [was] the first [she was] hearing that [Caruso] had resigned."

## II.  District Court Proceedings

On December 30, 2019, Caruso filed a nine-count complaint in Massachusetts state court alleging Delta committed multiple violations of federal law under Title VII (Counts II and VIII) and the ADA (Counts IV and IX) and of Massachusetts General Laws chapter 151B (Counts I, III, V, VI, and VII). Delta removed the lawsuit to federal court on January 29, 2020.

After discovery by both sides over eighteen months, Delta moved for summary judgment on all claims on August 3, 2021.

The district court granted Delta's motion on March 9, 2022. Caruso, 2022 WL 715709, at *10.

Caruso timely appealed.

## III. Analysis

We review an award of summary judgment de novo and may affirm "on any ground supported by the record." Burt v. Bd. of Tr. of Univ. of R.I., 84 F.4th 42, 54 (1st Cir. 2023). "Summary judgment is appropriate when the moving party . . . has shown that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law." Id.

Caruso argues she has demonstrated genuine issues of material fact as to three categories of claims: sex discrimination, disability discrimination, and retaliation, each in violation of both federal and state law. We examine each category in turn.

### A.

We begin with Caruso's sex discrimination claims under both Title VII and Massachusetts General Laws chapter 151B. We analyze each statute separately.

#### a. Title VII

To defeat Delta's motion for summary judgment on her Title VII claim, Caruso:

> must show that the record contains evidence from which a reasonable juror could find: (1) that she . . . is a member of a protected class; (2) that she was subjected to unwelcome sexual harassment; (3) that the harassment was

based upon sex; (4) that the harassment was sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment; (5) that sexually objectionable conduct was both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so; and (6) that some basis for employer liability has been established.

Forsythe, 27 F.4th at 72 (alteration in original) (quoting Ponte v. Steelcase Inc., 741 F.3d 310, 320 (1st Cir. 2014)). Caruso argues that the district court erred in holding she failed to carry her burden as to (6), that is, a basis for employer liability. We agree with the district court.[6]

"The Supreme Court has divided the universe of employer liability [under Title VII] along a line that separates supervisors from non-supervisors." Noviello, 398 F.3d at 94. The district court concluded "Caruso has not presented facts sufficient to permit a finding that Lucas was her supervisor," Caruso, 2022 WL 715709, at *4, and Caruso does not argue this was error.

As the district court correctly concluded, "Delta can be liable for Lucas' alleged misconduct only if the purported harassment is causally connected to [Delta]'s negligence." Id. at *5. As Noviello held, "[w]hen coworkers, rather than supervisors, are responsible for . . . a hostile work environment . . . an

---

[6] Because Caruso's Title VII claim depends on establishing that Delta was liable, no issue is presented as to whether Caruso was in fact subjected to unwelcome sexual advances.

employer can only be liable if the harassment is causally connected to some negligence on the employer's part." 398 F.3d at 95. The negligence analysis requires the court to review the employer's actions for reasonableness, not conduct an independent review of the underlying allegations. See Forsythe, 27 F.4th at 74 (asking whether employer conducted adequate investigation or "cho[se] to do nothing more than ask the accused about those allegations and then credit self-serving denials"; and noting that "[n]or, on this record, do we see how a reasonable juror could find that [the investigator's] credibility assessment of [the alleged harasser] was itself so lacking in support that the company acted unreasonably in relying on his investigation's finding that the allegations of inappropriate touching were 'unsubstantiated.'"). To succeed here Caruso must show a genuine issue of material fact both as to (1) a causal connection between Delta's action and the harassment she allegedly experienced and (2) that those actions by Delta amounted to negligence. We hold she has failed to carry her burden on both points.

First, Caruso cannot, as she must under the caselaw and the text of Title VII, show a genuine issue of material fact as to any causal connection between Delta's actions and the harassment she alleges she experienced.[7] Our cases make clear that such a

_____

[7] Even if there were disputes of material fact as to the nature of the sexual encounter between Lucas and Caruso and any

causal connection is a necessary prerequisite to employer liability.  See, e.g., Noviello, 398 F.3d at 95 (requiring "that the employer knew or should have known about the harassment, yet failed to take prompt action to stop it"); Forsythe, 27 F.4th at 73 (same); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 403 (1st Cir. 2002) (same).

More recently this causation requirement was affirmed by the Supreme Court.  In Muldrow v. City of St. Louis, the Supreme Court emphasized that the text of Title VII "requires that the employer have acted for discriminatory reasons," 144 S. Ct. 967, 976 (2024), in ways that create "'differences in treatment that injure' employees . . . 'with respect to' employment 'terms [or] conditions,'" id. at 974 (second alteration in original) (first quoting Bostock v. Clayton County, 590 U.S. 644, 681 (2020); and then quoting 42 U.S.C. § 2000e-2(a)1)).  Where there is no causal connection between an employer's actions and a co-worker's creation of a hostile work environment, it cannot be said that the "employer ha[s] acted for discriminatory reasons."  Id. at 976 (emphasis added).  Indeed, in Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), the Court held that employer

_____

consent, that does not go to the issue in this case, which is of Delta's liability and not Lucas's liability.  The record does not reveal whether Caruso ever brought a separate action against Lucas; he is not a defendant in this case.  Nothing in this opinion should be taken as approval of the conduct alleged.

liability for hostile work environment claims must satisfy agency principles of principal liability for agent actions, id. at 758.

Every co-worker harassment case that Caruso cites from this circuit is inapposite; each involved co-worker harassment that occurred or continued after the employer knew or should have known it was occurring. See Noviello, 398 F.3d at 82-83;[8] Forrest v. Brinker Int'l Payroll Co., 511 F.3d 225, 227-28 (1st Cir. 2007). This court's decision in Forsythe supports the result we reach. Forsythe establishes that an employer cannot be held liable where there is no causal relationship between its investigation and the harassment. See 27 F.4th at 72-74.

Caruso does not argue, nor could the record support, that Delta should have known before August 3, 2018, that Lucas might sexually assault a flight attendant. Rather, Caruso argues that there is a genuine issue of material fact as to whether Delta "declined to conduct a thorough and good-faith investigation of . . . Caruso's sexual harassment and/or failed to take prompt action to stop and prevent further sexual harassment." Not so.

As Delta argues, the record makes clear, and Caruso does not dispute, that Caruso was on leave from August 4, 2018, through

---

[8] Noviello involved one claim based on a single incident of harassment, and the court declined to hold the employer liable for it, noting that "there is no evidence that [the plaintiff] was forced to work with [the alleged harasser] or was exposed to further harassment by him [after the initial harassment occurred]." 398 F.3d at 97.

June 2, 2019, and, in the brief period of time she worked between June 2 and July 26, 2019, she "never encountered Lucas, never requested to either swap or be removed from a flight, never had a scheduled flight with him, [and] did not require alternative lodging or transportation [to avoid Lucas]."

On these facts there is no genuine dispute of material fact that Caruso's allegations of a hostile work environment, which arise out of an alleged sexual assault the night of August 3-4, 2018, are causally connected to any actions by Delta.[9]  See Noviello, 398 F.3d at 97 (upholding summary judgment for employer where "[t]he first that the city knew (or could have known) about . . . assaultive demeanor was when it received the initial report of the attack" and there was "no evidence that [plaintiff] was forced to work with him or was exposed to further harassment by him").  That suffices to warrant entry of summary judgment for Delta.

Second, and independently, Caruso cannot show a genuine issue of material fact as to whether Delta was negligent in its

_____

[9] Caruso argues that "[a] jury is entitled to find that [her] medical leave was unlawfully prolonged by" Delta's failure to remedy "the hostile work environment."  This record would not allow for such a finding.  As we discuss, Delta and Caruso engaged in an interactive process to develop accommodations that would allow her to return to work.  Caruso accepted those accommodations and voluntarily returned to work despite knowing that Delta had taken none of the actions she now argues were essential to remedying this allegedly hostile work environment.

response to her allegations. Once Delta "knew or should have known" that Caruso had alleged she had experienced sexual harassment that "alter[ed] the conditions of [her] employment and create[d] an abusive work environment," Delta did "take prompt action to stop it" by "conduct[ing] a reasonable investigation into the allegations." Forsythe, 27 F.4th at 72-73. Delta's duty to investigate the issue did not arise until Delta know or should have known that Caruso believed Lucas was her alleged assailant. Caruso does not argue that Delta had a duty under Title VII to investigate an alleged sexual assault during a layover in Dallas if that sexual assault was committed by an individual who was not a Delta employee.

Caruso's first report to Delta of a possible sexual assault was on August 5, 2018, and Caruso did not then identify anyone, much less a Delta coworker, as her alleged assailant. Delta promptly investigated. Caruso's argument is wrong that Delta should have known she believed Lucas had assaulted her simply because "within [six] days of the incident, Delta knew" that Caruso believed she had been sexually assaulted that evening and that Lucas had been a member of the group that had gone out in Dallas, had escorted her to her room, and had "hung out" in that room for some amount of time. The record makes clear that Caruso herself did not tell Delta until December 18, 2018, when she filed her first MCAD complaint, that she believed Lucas was her alleged

assailant.  Neither Caruso's statements to Delta, nor her recorded statement when she went to Beth Israel Deaconess Hospital on August 4 to complete a sexual assault kit, nor her statement to Middleborough police on September 26 make any reference to anyone as an alleged assailant, much less Lucas.

The earliest evidence in the record that Delta reasonably had notice that its employee Lucas might be suspected of having assaulted Caruso dates from October 3, 2019, when Det. Anderson contacted Delta's Mack and Broach to discuss Caruso's allegations and to request that Delta provide information about Lucas.  There is no genuine dispute that the earliest possible date that Delta knew or should have known that Caruso believed Lucas had been the person who assaulted her was October 3.

Only at the point of notice must an employer engage in a "good faith effort to implement an effective remedial measure." Crowley, 303 F.3d at 404.  Where the employer investigates but concludes it need go no further, that investigation must be reasonable.  Forsythe, 27 F.4th at 73.  Summary judgment for the employer is appropriate where there is no genuine dispute of material fact that the employer's investigation "was [not] so deficient that it would not permit [the employer] to rely on its finding."  Id.

On this record, there is no genuine dispute of material fact that Delta's investigation "was [not] so deficient that it

would not permit [Delta] to rely on its finding." Id. Delta had already collected statements from every potential witness within its control as of August 8, including flight attendants Brown, Mercer, and Caruso, as well as Lucas and the Delta representative who answered Caruso's midnight phone call to the OCC. Delta was also aware of Caruso's erratic behavior at the hotel overnight and failed alcohol test the following morning, for which Caruso had never offered any explanation. As of October 3, Delta had been reliably informed that the Dallas hotel had overwritten video footage of the night in question by late August,[10] and that neither the police nor Delta could obtain the tapes. And the reason for that was because Caruso had not filed a police report earlier (despite strongly suggesting to Delta that she had already done so).[11] By early January 2019, Delta had learned that Dallas police had concluded that there was "no evidence to support that an

---

[10] The record does not support Caruso's argument that Delta employees were offered the opportunity to travel to the Dallas hotel to view the security footage at some unidentified point but negligently failed to do so. As such, Caruso has failed to carry her burden to "present sufficient affirmative evidence of [her] own to create material issues of fact." Bannon v. Godin, 99 F.4th 63, 83 (1st Cir. 2024).

[11] Caruso argues that Delta was negligent for failing to request that the hotel preserve the footage and/or failing to coordinate with her to ensure a police report was filed. This argument ignores the fact, as we hold, that Delta was on notice no earlier than October 3 that Caruso believed her alleged assailant was a Delta employee. It also ignores Delta's objectively reasonable belief that she had filed such a report, as well as her later unsupported explanations for why she had not done so.

offense occurred." Until that point, Delta had reason to think that Lucas was cooperating with the police investigation, and Det. Anderson did not notify Delta that Lucas was not cooperating until early January 2019. Delta then interviewed Lucas, and there is no indication in the record that Delta somehow shielded Lucas from the police investigation. In this context, the police's conclusion alone strongly supports Delta's "rel[iance] on its findings," Forsythe, 27 F.4th at 74, that were consistent with that police investigation. Like Forsythe, "[t]his is not a case in which . . . the investigation involved the employer choosing to do nothing more than ask the accused about th[e] allegations and then credit self-serving denials." Id.

Even after that police conclusion, Delta continued to take action. Three Delta employees, including at least one individual "responsible for taking disciplinary action against" Lucas for any misconduct, interviewed Lucas on April 3, 2019. These Delta employees concluded that Lucas's statements that his sexual encounter with Caruso was consensual, in light of consistent witness statements and other evidence, were credible.[12] We do not

_____

[12] Caruso argues that emails between Delta and counsel for the pilots' union demonstrate that Delta conducted this interview "not with an eye toward disciplining him or otherwise holding him accountable." These emails have nothing to do with Delta's investigatory posture during Lucas's April 2019 interview. The emails Caruso cites are from January 2020, nine months after Lucas was interviewed in April 2019, and refer to Delta's posture as to some meeting to come later in 2020. Indeed, they specifically

"see how a reasonable juror could find that [Delta]'s credibility assessment of [Lucas] was itself so lacking in support that the company acted unreasonably." Id. Summary judgment for Delta was appropriate.

> b.   Chapter 151B

We turn next to Caruso's Massachusetts state law sex discrimination claim under chapter 151B, which we analyze separately from Caruso's Title VII claim. The two standards, while similar, are not identical. The Massachusetts Supreme Judicial Court ("SJC") has held that employers are liable under chapter 151B for a hostile work environment created by a coworker rather than a supervisor where "the employer is aware of sexual harassment in the workplace . . . and fails to take adequate steps to remedy the situation." College-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 591 (Mass. 1987). Similarly to the Title VII analysis, courts focus on the reasonableness of the employee's investigatory process. See id. at 594 (holding that investigation was inadequate for reasons including that the plaintiff was "never informed about the staff meeting, while [the harasser] was present throughout," "[t]he staff were never questioned individually," and the plaintiff "was

---

state that Bryan Dickerson, the individual with disciplinary powers who in fact attended Lucas's April 2019 interview, "will not be in the meeting" the emails attempt to arrange.

- 34 -

never provided an opportunity to confront [the alleged harasser], nor was she interviewed after [the alleged harasser] had been approached."); Trinh v. Gentle Commc'ns., LLC, 881 N.E.2d 1177, 1185 (Mass. App. Ct. 2008) (asking, among other things, whether interviewer asked relevant questions, whether the plaintiff was kept informed and given opportunities to participate, and how questioning proceeded).

The text of chapter 151B and state caselaw require that there be (1) a causal relationship between the employer's response to its notice of harassment and the employee's experience of it and (2) that the employer's response be inadequate.[13]  See, e.g., College-Town, 508 N.E.2d at 591 (holding liability would require employer to have failed to take adequate remedial steps once aware).  Caruso has failed to demonstrate a genuine issue of material fact on both points.

Caruso's chapter 151B claim against Delta must fail because there is no evidence in the record creating a genuine dispute that Delta's response had any causal relationship to Caruso's allegedly being sexually assaulted on the night of August 3-4, the only alleged harassment in this case.  See Trinh, 881 N.E.2d at 1184 ("An employer may be found directly liable for

---

[13] Because Caruso's chapter 151B claim depends on establishing that Delta was liable, no issue is presented as to whether Caruso was in fact subjected to unwelcome sexual advances.

discrimination under [chapter 151B] if it is notified of sexual harassment in its workplace and fails to take adequate remedial action."); City of Springfield v. United Pub. Serv. Emps. Union, 47 N.E.3d 447, 453 (Mass. App. Ct. 2016) ("[Chapter 151B] requires an employer to take some remedial action in cases of confirmed sexual harassment." (emphasis added)).  Summary judgment for Delta on Caruso's chapter 151B sex discrimination claim was appropriate on this basis alone.

Caruso's state law claim also independently fails for her failure to demonstrate a genuine issue of material fact as to whether Delta's response to her allegations of sexual harassment was inadequate under Massachusetts state law.  As discussed, on this record there can be no genuine dispute that the earliest possible date that Delta "[wa]s aware of sexual harassment in the workplace," College-Town, 508 N.E.2d at 591, was October 3.

To determine whether Delta's actions after this date were "adequate" under Massachusetts state law, the SJC has held that we are "not to focus solely upon whether the remedial activity ultimately succeeded, but instead should determine whether the employer's total response was reasonable under the circumstances as then existed."  Mod. Cont'l/Obayashi v. Mass. Comm'n Against Discrimination, 833 N.E.2d 1130, 1140 (Mass. 2005) (quoting Berry v. Delta Airlines, Inc., 260 F.3d 803, 811 (7th Cir. 2001)).  The SJC has held that employer liability can be inappropriate even

where harassment in the workplace continues after the employer's response. Id. ("[I]t is not always possible for an employer to completely eliminate offensive behavior." (quoting Turnbull v. Topeka State Hosp., 255 F.3d 1238, 1245 (10th Cir. 2001))). This is so because "the effectiveness inquiry looks not to whether offensive behavior actually ceased but to whether the 'remedial and preventative action was reasonably calculated to end the harassment.'" Id. (emphasis added) (quoting Turnbull, 255 F.3d at 1245).

Where the employer determines based on a reasonable investigation under the circumstances that it cannot find sufficient evidence to support the employee's allegations, employer liability is inappropriate. Id. at 1143. "Thus, a plaintiff does not establish an employer's liability merely by showing that the employer 'could have done more.'" Id. at 1140 (quoting Berry, 260 F.3d at 813). "Nor is an employer required to take what would, with hindsight, be considered better or more effective measures." Id. Instead, "the plaintiff must show 'that the steps that [the employer] actually took were not reasonabl[e],'" id. (first alteration in original) (quoting Berry, 260 F.3d at 813), and "the mere fact that the victim is not satisfied with the employer's response does not suffice to render that response unreasonable," id. at 1141.

Delta's post-notice investigation "was reasonable under the circumstances as [they] existed" after October 3. Id. at 1140 (quoting Berry, 260 F.3d at 811). In Modern Continental, the SJC reversed the MCAD's conclusion that Modern Continental's investigation into allegations of sexual harassment on a construction site was unreasonable. Id. at 1142-43. The SJC held, contrary to the MCAD's conclusion, that Modern Continental had acted reasonably "as a matter of law" in investigating the identity of the alleged harasser[s] where, as here, the victim "herself could not make any identification of the perpetrators . . . from her recollection of the incident," and the employer nevertheless "made efforts to uncover the identity of the various perpetrators" but was unable to do so. Id. at 1141, 1142. This was particularly so given that the employer sought the help of a third party in its investigation but was rebuffed. Id. at 1142. Here, like in Modern Continental, Delta sought assistance from a third party, the Dallas hotel, who declined to assist Delta unless Caruso filed a police report. Caruso failed to do so, despite several opportunities and strongly suggesting to Delta that she already had.

Indeed, the employer in Modern Continental conducted an investigation that was reasonable as a matter of law despite failing to identify and speak with additional "employees who were in the vicinity" at the time of the alleged assault. Id. at 1143. Here, in contrast, it is undisputed that Delta spoke with every

individual who conceivably had information about the events of August 3-4, 2018. And although, as discussed, instances of harassment post-notice are not necessarily sufficient to support employer liability, the SJC in Modern Continental cited as evidence in support of its holding denying employer liability the fact that "there was no form of sexual harassment perpetrated []after" the investigation. Id. The same is true here.

Like the employer in Trinh and unlike the employer in College Town, Delta investigators "asked their interview subjects relevant questions about the behavior of all involved regarding the plaintiff's allegations," and "questioned [employees] individually, thereby allowing them to speak more freely." Trinh, 881 N.E.2d at 1185; see also College Town, 508 N.E.2d at 594 (upholding MCAD finding of inadequate investigation where, inter alia, "staff were never questioned individually").[14]

The reasonableness of Delta's investigation is established by the independent conclusion reached by the Dallas police that there was "no evidence to support that an offense occurred." The record does not support a conclusion that Delta

_____

[14] The SJC in College Town also found the employer's investigation inadequate in part because the victim "was never provided an opportunity to confront [her alleged harasser] nor was she interviewed after [other employees] had been approached." 508 N.E.2d at 594. Caruso does not argue that Delta's investigation was inadequate for failing to take any such steps, nor does anything in the record establish whether she desired or would have participated in any such investigative actions if offered.

- 39 -

shielded Lucas from the police investigation, and Delta was not informed that Lucas was "not cooperat[ing]" with the investigation until early January 2019. Delta continued its investigation after the police investigation closed and concluded, after interviewing Lucas on April 3, 2019, that his version of events was credible. The record here does not compel the conclusion that Delta had to accept Caruso's version of the events of August 3-4, 2018. This case presents, at most, "a difficult personnel matter on a contested complaint" on which the employer declined to impose discipline, a circumstance in which Massachusetts courts decline to impose employer liability. Trinh, 881 N.E.2d at 1185 (upholding on that basis judgment for defendant employer notwithstanding jury verdict for plaintiff).

There is no genuine dispute of material fact on this record that Delta's investigation and conclusions "w[ere] [un]reasonable under the circumstances as then existed." Mod. Cont'l, 833 N.E.2d at 1140 (quoting Berry, 260 F.3d at 811). Summary judgment for Delta on Caruso's chapter 151B sex discrimination claims was also appropriate on this independent ground.

**B.**

We turn next to Caruso's claims under the ADA and chapter 151B for disability discrimination. "We 'analyze claims under the ADA and under [chapter 151B] using the same framework.' Thus,

- 40 -

'[a]lthough we write in terms of the ADA, our comments apply with equal force to [Caruso]'s claim under its state-law counterpart.'" Sarkisian, 85 F.4th at 675 (citations omitted) (second alteration in original) (first quoting Jones v. Nationwide Life Ins. Co., 696 F.3d 78, 86 (1st Cir. 2012); and then quoting Gillen v. Fallon Ambulance Serv., Inc., 283 F.3d 11, 20 n.5 (1st Cir. 2002)).

An employee's request for accommodation of a covered disability triggers a duty that both employer and employee engage in an interactive process in good faith to develop reasonable accommodations. See, e.g., Ortiz-Martínez v. Fresenius Health Partners, PR, LLC, 853 F.3d 599, 605 (1st Cir. 2017). Where the employee does not cooperate in that process in good faith, "the employer cannot be held liable . . . for a failure to provide reasonable accommodations." Id. (quoting Enica v. Principi, 544 F.3d 328, 339 (1st Cir. 2008)).

Caruso declined to cooperate in an interactive process to develop reasonable accommodations in response to her July 24, 2019, demand that Delta reconsider her accommodations and so cannot hold Delta liable for an alleged failure to provide accommodations. The parties engaged in an interactive process to develop accommodations in May 2019, developing a set of accommodations Caruso accepted and under which she returned to work. Then on July 24, Caruso demanded that Delta capitulate to all her originally requested accommodations within forty-eight

hours or she would consider herself constructively discharged as of July 26.

This demand triggered Caruso's and Delta's mutual obligation to once again engage in an interactive process in good faith. By declining Delta's request for discussion and an extension of Caruso's forty-eight-hour deadline, Caruso failed to do so. Indeed, the record shows that by July 22, two days before she sent this demand letter through counsel, Caruso had obtained an offer of employment elsewhere and recorded in that application that July 26 would be her last day as a Delta employee. Summary judgment on her disability discrimination claims under the ADA and chapter 151B was appropriate.

## c.

Caruso's final claim is for retaliation in violation of federal and state law. Under both federal and state law Caruso must "show that (1) she undertook protected conduct; (2) she suffered an adverse employment action[;] and (3) the two were causally linked." Cherkaoui v. City of Quincy, 877 F.3d 14, 28 (1st Cir. 2017) (quoting Noviello, 398 F.3d at 88).

Caruso argues that she suffered two adverse actions: First, that Delta "dragged out the disability accommodations process, forcing [her] to remain on medical leave for four months." Caruso did not raise this argument to the district court and thus may not raise it now on appeal. See Vázquez-Rivera v. Figueroa,

759 F.3d 44, 49 (1st Cir. 2014) (holding argument made for first time on appeal waived).

Second, Caruso argues that "Delta gave her a verbal warning about her efforts to locate . . . Lucas for the purpose of service of legal process and removed her from a flight, causing [her] to lose income." Caruso failed to develop this argument in her opening brief and so it is waived. See United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("[I]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived.").

## IV. Conclusion

For the foregoing reasons we **affirm** the district court's entry of summary judgment for Delta on all counts.

**-Dissenting Opinion Follows-**

**THOMPSON, <u>Circuit Judge</u>, dissenting in part.**

## Opening

The majority is flat wrong to say that Caruso raises not even *one* material fact in reasonable dispute under governing law on whether Delta adequately investigated her sexual-assault charge against Lucas. Which is why I'd vacate the summary-judgment grant to Delta on Caruso's Title VII and chapter 151B claims.

## Misreading the Facts

Caruso and Delta engage in a factual scrum. And the majority joins Delta's side. But because summary judgment isn't a time for factfinding by judges (district or circuit) — that's what trials are for — we must accept (for present purposes only) Caruso's properly documented account (without vouching for its accuracy), resolving evidentiary conflicts, credibility calls, and competing inferences in her favor (even though a jury might later find Delta's story more believable). <u>See, e.g.</u>, <u>Tolan</u> v. <u>Cotton</u>, 572 U.S. 650, 659-60 (2014) (per curiam); <u>Marcano-Martínez</u> v. <u>Cooperativa de Seguros Múltiples de P.R.</u>, 991 F.3d 336, 338 (1st Cir. 2021); <u>Kuperman</u> v. <u>Wrenn</u>, 645 F.3d 69, 73 (1st Cir. 2011); <u>Morelli</u> v. <u>Webster</u>, 552 F.3d 12, 18-19 (1st Cir. 2009). <u>See generally</u> <u>Anderson</u> v. <u>Liberty Lobby, Inc.</u>, 477 U.S. 242, 251-52 (1986) (stating that summary judgment is proper only if the evidence "is so *one-sided* that one party *must* prevail as a matter of law" (emphases added)). Yet in a script-flipping move, the

majority relies on *Delta's* version rather than *hers*.  To see the point, consider these examples — separated into numbered sections and discussed (for the most part) in the order in which they appear in the lead opinion.

*1.* The majority says that "[t]he evidence as to Caruso's call, her text messages, and the hotel's report" (all of which occurred in August 2018) "does not conflict with Lucas's timeline of the night."

What the majority subtly implies is that these pieces of evidence corroborate Lucas's story.  Hardly.

Lucas claims "that his sexual encounter with Caruso was consensual" (a quote lifted from the majority opinion), offered as push back against Caruso's claim that she was too impaired to consent.  And viewed from her perspective, the trio of evidence the majority highlights — her drunk call to Delta, her drunk texts to flight attendant Brown, and her drunk hotel run in nothing but her underwear (none of which she remembers doing) — assists Caruso's claim because it undercuts Delta's investigative conclusion that the sexual activity was all right consent-wise.

Perhaps if one squints hard enough one might be able to infer consent from her asking for Lucas by name during the Delta call.  But even that doesn't rebut Caruso's point about being too impaired.  Not only can't we draw adverse inferences against her.  But as the majority notes — yet (somehow) doesn't consider helpful

to her case — she (per Delta documents) spoke to the Delta operator "with slurred speech," rambling "repetitive[ly]" and "incoherent[ly]." And Delta was so worried that she might still be too impaired to do her job *hours later* that it initiated its alcohol-screening protocols.

A persistent theme in the majority opinion (here and elsewhere) is that Lucas told a "consistent" story — from his August 2018 statement, through his April 2019 interview, and up to his May 2021 deposition. If only. See generally Tarrify Props., LLC v. Cuyahoga Cnty., 37 F.4th 1101, 1110 (6th Cir. 2022) (recognizing that "[r]epetition of the key theme . . . does not make it so").

Take Lucas's August 2018 statement. Lucas reported that he and the "three flight . . . attendants" went to "dinner"; that he and Caruso "walked" flight attendant Brown "to her room and then decided to hang out and talk for a while"; and that he "later went to [his] room and had no further interaction with any of the flight attendants that evening." Lucas didn't mention going to bars or to Caruso's room after walking Brown to hers (he never says where he and Caruso "h[u]ng out and talk[ed] for a while"). And he didn't say a peep there about his sexual activities with Caruso.

Next consider Lucas's April 2019 interview. Lucas revealed for the *first time* there that he and the flight attendants

went to "bars" (plural); that he bought them "drinks" (though he couldn't remember how many); that Caruso "was fine" when the group returned to the hotel (she wasn't drunk); that to his knowledge she didn't have anything to drink when the group got back to the hotel; that he "[h]ung out" with Caruso "in her room"; that he and Caruso consensually "kissed and touched" each other; and that when he returned to her room after a getting a condom from his (which took him "15-20 minutes") she "was too intoxicated" and so he "[h]elped her into bed" and left.  Lucas copped to all this only *after* Delta told him that the interview was "*not* a disciplinary hearing" and that Delta was "operating under the premise that FO Lucas *has* told and *will continue* to tell the *truth*" (emphases added).  The reader can be forgiven for not knowing Delta's truth-telling presumption until now because the majority doesn't mention it, let alone say why that presumption doesn't affect its Delta-reasonably-investigated conclusion.

Finally ponder Lucas's May 2021 deposition.  Lucas admitted for the *first time* there that he "follow[ed]" Caruso into her room, undressed her, performed oral sex on her, penetrated her vagina and anus with his fingers, and put his penis "where her face was"; that Caruso was "under the influence of alcohol" between 9 p.m. and midnight (a period that covered his sexual encounter with her); and that an intoxicated person is "incapable of giving consent."  Taking the facts and all justifiable inferences arising

from them in the light most sympathetic to Caruso, a rational jury could conclude that a person "under the influence of alcohol" during sexual activity and "intoxicated" within "15-20 minutes" after that activity ended didn't have the ability to consent during the activity.

Given how significant Lucas's inconsistencies are, the majority can't handwave them away by saying that some of his descriptions simply provided "less detail" than others.

**2.** In the majority's recounting, "Mercer's and Lucas's statements, like Caruso's initial statement, focused on the group's activities at the various Dallas bars they had visited."

Mercer's and Caruso's statements mentioned "drinks." Lucas's didn't (as I just noted) — his only mentioned "dinner."

**3.** The majority writes that "Caruso's physical exam was unremarkable except for a bruise on her right hip, pain to her chin area, and petechiae — small red spots — around her eyes," noting too that "[d]espite options to check 'no' on the exam report for whether the 'assailant(s) attempt[ed] to strangle patient,' the examiner checked 'unsure' and wrote on the blank line following '[i]f yes, describe,' that 'patient had petechiae around eyes.'"

The phrase "unremarkable except for" (among other things) "petechiae" is like the proverbial "other than that, Mrs. Lincoln, how was the play?" That is because petechiae can result from strangulation — something Caruso's nurse examiner *couldn't*

- 48 -

rule out.  The majority mentions this and other like-evidence in its fact section — *i.e.*, Caruso's telling Delta that she had petechiae in her "eyes that was indicative of attempted strangulation" — but not in its analysis section.  And the majority never explains why we can ignore that evidence and still stamp Delta's investigation reasonable.

**4.**  The majority notes that "Caruso['s]" August 5, 2018 email to Delta's Amy Broach "did not identify Lucas or anyone else as the individual she believed had 'potentially' drugged and assaulted her at this time."

That's true but is only half the story.  Thanks to flight attendant Mercer's statement (a statement the majority also quotes from), Delta knew by August 6 that Lucas (whom Mercer referred to as first officer "James") had partied with the flight attendants and then had taken Caruso to her hotel room.  Broach (as the majority notes) also emailed Delta officials on August 8 that flight attendant Brown said "yes F/O Lucas escorted them to their rooms," going "first" to Brown's and then to Caruso's.  Anyway, the majority never runs these facts through its reasonable-investigation analysis.

**5.**  "Caruso," the majority adds, "did not file a police report with either the Dallas or Massachusetts authorities" two days after her claimed assault, "nor did she tell Delta she had not done so."

- 49 -

One could infer that the majority believes that Caruso's not immediately filing a police report is evidence that she hadn't been sexually assaulted at all. But that victim-shaming intimation is indefensible given that we must view the facts and draw reasonable inferences in the light most generous to Caruso. See, e.g., Marcano-Martínez, 991 F.3d at 338; Kuperman, 645 F.3d at 73; Morelli, 552 F.3d at 18-19. Common sense and experience teach that lots of survivors hesitate to report sexual assaults for many legitimate reasons. And on that point, Caruso's nurse examiner wrote — where the form asked about "the patient's general physical appearance and demeanor" — that Caruso was "teary, quiet"; had a "friend at bedside to hold her hand [and] support her"; "took *a lot of convincing* to stay [and] do [rape] kit"; and was "*self-blaming*," "then angry [and] *scared*" (emphases added). If what the majority implies (without citing any authority) is that responsible jurors could draw an adverse credibility inference from Caruso's report-filing delay, I need only remind that we must resolve "reasonable doubts and issues of credibility" in her "favor" — *not* Delta's. See Marcano-Martínez, 991 F.3d at 338 (quoting Hernandez-Loring v. Universidad Metropolitana, 233 F.3d 49, 51 (1st Cir. 2000)).

**6.** A subheading in the majority opinion reads matter-of-factly, "Delta" in August 2018 "incorporate[d] Caruso's concerns about possible sexual assault into its investigation."

- 50 -

Notably missing from the majority's recounting is this: Caruso's supervisor (Broach), whose fingerprints are all over this case (Delta tasked her with "gather[ing] the facts to determine what happened"), agreed that she "had no role with respect to any investigation into . . . Lucas regarding allegations of sexual assault" — even though Caruso told Broach that she (Caruso) was "terrifie[d] . . . to think that [she] was potentially drugged and assaulted and ha[d] no memory of it." Also notably missing is this: When Broach asked Lucas for his statement (which he initially refused to give), she (per a Delta employee in the know) made the "request[]" because Caruso "failed a breathalyzer when reporting for duty" on August 4 — *not* because of any sexual-assault allegations. And notably missing is this too: Lucas answered "*no*" when asked in his 2021 deposition whether (to his knowledge) he had "*ever* been the subject of an investigation" during his time at Delta (emphases added). The majority doesn't say why these facts have no role in its reasonable-investigation inquiry.

**7.** "Caruso," according to the majority, did not "disclose[] her own phone call to Delta OCC to the police."

The majority is talking about the Middleborough police report narrative, one written by the interviewing officer (it's not a self-authored victim statement). And, yes, that narrative doesn't include her disclosing the call (she had no independent memory of making the call). But maybe she did disclose it and the

officer failed to include it (absence of evidence isn't evidence of absence (as the saying goes)). To the extent the majority (again) looks to damage Caruso's credibility with this did-not-disclose comment, I (yet again) fall back on the baseline rule that we must (not may, but must) resolve "reasonable doubts and issues of credibility" in her "favor" — *not* Delta's. See id. (quoting Hernandez-Loring, 233 F.3d at 51).

**8**. "Delta cooperated with Det. Anderson's investigation," or so the majority insists.

Looking for support, the majority reports that in October 2018 (a) Delta sent Anderson Lucas's August 2018 statement and helped him contact a Delta pilot who then contacted Lucas, and (b) Anderson told Delta that Lucas was "cooperating." But (a very big "but") Anderson bluntly told Delta in January 2019 (when the police stopped investigating) that "Lucas *did not cooperate* with the investigation" (emphasis added) — a fact the majority mentions in the fact section but ignores in the analysis section.

Given Anderson's Lucas-didn't-cooperate finding, the majority's later claim that the police's ending their inquiry "alone strongly supports" the reasonableness of Delta's investigation is jarringly improper. Delta (as explained before) responded to that Lucas-didn't-cooperate appraisal by still presuming him to be a reliable truth-teller when its functionaries questioned him in April 2019 — a fact (to repeat) the majority

pays no mind to. And approaching the record from the required Caruso-friendly vantage, a sensible jury could conclude that the police's actions undermine rather than support (to say nothing of "strongly support[]") Delta's Lucas-is-credible position.

**9.** To keep quoting the majority, "[t]he record makes clear that Caruso herself did not tell Delta until December 18, 2018, when she filed her first MCAD complaint, that she believed Lucas was her alleged assailant."

That's correct but is irrelevant. The majority itself acknowledges (in the very next paragraph) that Dallas police "contacted Delta's [Lance] Mack [(of Delta corporate security)] and [Amy] Broach [(Caruso's then-Delta supervisor)]" on October 3, 2018 "to discuss Caruso's allegations and to request that Delta provide information about Lucas." And about a week later Dallas police (as said above) informed Delta that Lucas was a "*suspect*" (emphasis added). If the majority is implying (sans case cites) that a levelheaded jury could make an adverse credibility inference based on when Caruso ID'd Lucas, I need only resay (kind of cut-and-paste style) that we must settle "reasonable doubts and issues of credibility" in Caruso's "favor" — *not* Delta's. See id. (quoting Hernandez-Loring, 233 F.3d at 51).

**10.** In the majority's words, "the reason" neither the police nor Delta could get the hotel tapes "was because Caruso had not filed a police report earlier (despite strongly suggesting to

- 53 -

Delta that she had already done so)."

Construing all facts and inferences in the light most sympathetic to Caruso instead of Delta, one sees that the company failed to follow its own policy by not asking the hotel to preserve key-card data and video recordings after "an allegation of a crime" — *i.e.*, an "allegation[] of someone being intoxicated, drugged and possibly assaulted." And Delta still had the chance to review (though not keep) the hotel's videos, but did not — even though Delta conceded that footage "from the night of the alleged assault [would] be important to review." The majority never mentions any of this and so never says how its reasonable-investigation idea can still stand given these Delta missteps.

*11.* "Delta," the majority asserts, "interviewed Lucas" in April 2019, "and there is no indication in the record that Delta somehow shielded Lucas from the police investigation."

My point isn't that Delta obstructed the police investigation. It's that viewing the evidence and inferences in the light most pleasing to Caruso, a sensible jury could find Delta's Lucas-is-credible stance so flawed that the company acted unreasonably. And if the majority is suggesting that Delta had to interfere with the police's investigation to be on the liability hook here, it offers no legal authority for that proposition (and I know of none).

*12.* The majority contends that "[e]ven after" the police

closed the case "Delta continued to take action."

One of Delta's "action[s]" was to (finally!) interview Lucas in April 2019 (eight months after the Dallas events), but only after telling him (as noted above) that "[t]his [was] not a disciplinary interview" and that Delta "operat[ed] under the premise that [he] *has told and will continue to tell the truth*" (emphasis added). And Delta viewed him as a truth-teller — which the majority fails to mention, let alone grapple with — even though he didn't cooperate with the police (that's law enforcement's ultimate conclusion) and pushed an ever-shifting account of what had happened. Only by averting its eyes from these facts can the majority say that it doesn't "see how a reasonable juror could find that [Delta]'s credibility assessment of [Lucas] was itself so lacking in support that the company acted unreasonably" (quotation marks omitted but bracketed words added by the majority).

**13.** The majority declares that "disputes of material fact as to the nature of the sexual encounter between Lucas and Caruso and any consent" don't matter because (the theory continues) they don't "go to the issue in this case, which is . . . Delta's liability and not Lucas's."

But these "disputes" matter a great deal. When Delta (at long last) interviewed Lucas in April 2019, it already had plenty of info indicating that Caruso was too impaired to consent

to sexual activity (info the majority relays in some in detail, by the way).  And a clearsighted jury could find that by buying Lucas's claim of "consensual" sexual conduct, Delta's Lucas-is-credible take was (as said before, and despite what the majority says) so unsupported that the company acted unreasonably.

## Misreading the Law

Not only do genuine fact disputes preclude summary judgment for Delta.  But the law doesn't compel summary judgment for Delta either.

To give credit where credit is due, the majority is right that in the Title VII and chapter 151B milieus, "courts focus on the reasonableness" of the company's "investigatory process."  But I see no support for the majority's Kafkaesque suggestion that because Caruso wasn't sexually assaulted a second time she can't defeat summary judgment on her insufficient-investigation theory against Delta.

Starting with Title VII, the majority talks a lot about "causal connection," proclaiming (for example) that Caruso must show a genuine dispute of material fact about whether "a causal connection" exists "between Delta's action and the harassment she alleges she experienced."  The majority cites Noviello v. City of Boston, 398 F.3d 76 (1st Cir. 2005), abrogation on other grounds recognized by Stratton v. Bentley Univ., No. 22-1061, 2024 WL 3823034, at *10 (1st Cir. Aug. 15, 2024).  And some of Noviello's

- 56 -

language seems to offer some surface support for the majority's apparent view that an employer's poor investigation must cause further harassment to trigger liability. On that point, the majority plays up how Noviello said that "[w]hen coworkers . . . are responsible for . . . a hostile work environment . . . an employer can only be liable if the harassment is causally connected to some negligence on the employer's part." 398 F.3d at 95. The majority also emphasizes how Noviello said that liability typically turns on whether "the employer knew or should have known about the harassment, yet failed to take prompt action to stop it." Id.

A deeper dive, however, shows that Noviello said all this in analyzing a *retaliation* claim. On the *insufficient-response* claim, Noviello analyzed the employer's response after the employee's complaint without requiring a second assault for her to win. Noviello held that the employer reacted to the plaintiff's assault charge "swift[ly], effective[ly], and *non*-negligent[ly]," id. at 81 (emphasis added), and also concluded that "a rational jury" could only find that the employer performed "professional[ly]" and "appropriate[ly]" in addressing the assault charge, id. at 97-98. But (as mentioned earlier) a sensible jury could readily find that Delta acted in precisely the opposite way here.

Still pushing Noviello, the majority spotlights another quote from that opinion (with the bracketed words added by the majority) — "there is no evidence that [the plaintiff] was forced to work with [the alleged harasser] or was exposed to further harassment by him [after the initial harassment occurred]." Id. at 97. Noviello said that in response to the plaintiff's claim that the "seven days" that "elapsed between the time of the assault and the commencement of disciplinary proceedings" was too long, to which Noviello also said that "there is nothing to indicate that the [employer] acted here in a dilatory manner." See id. But the passage the majority trumpets is irrelevant because Delta never disciplined Lucas, meaning that quote can't do the work the majority asks of it.

A more on-point case is Forsythe v. Wayfair Inc., 27 F.4th 67 (1st Cir. 2022), which — regardless of what the majority thinks — helps (not hurts) Caruso. Emily Forsythe told her employer that a coworker had sexually harassed her. Forsythe, 27 F.4th at 70. The employer investigated. Id. The opinion gives no hint that anyone harassed her after she reported what had happened. See id. at 70-75. And in language useful to Caruso, Forsythe noted that her claim "hinge[d] on whether [the company] reasonably investigated the allegations" — i.e., her summary-judgment challenge "turn[ed] on the strength of her contention that a reasonable juror could find that the investigation . . .

was *so deficient* that it would not permit" the company "to rely on its finding" that the sexual harassment couldn't "be substantiated." Id. at 73 (emphases added).[15] So if — as the majority strongly implies — a judge could jettison such a claim for lack of re-harassment after the plaintiff reports the original harassment, then Forsythe wouldn't have had to examine the investigation's adequacy.

Invoking Forsythe, the majority writes (and this is a quote quoted above) that it can't "see how a reasonable juror could find that [Delta's] credibility assessment of [Lucas] was itself so lacking in support that the company acted unreasonably" (quotation marks omitted but bracketed words added by the majority). But I see reasons aplenty to question the legitimacy of Delta's credibility take and thus the reasonableness of its investigation. To pick just three (most of which should sound familiar by now): Delta (to begin) had gobs of evidence that Caruso was heavily (and I do mean *heavily*) intoxicated on the night of August 3 — her drunk call to Delta, her drunk texts to Brown, and her drunk dash through the hotel in her underwear are dead giveaways. Caruso recalled none of this, from which a reasonable

---

[15] Citing to page 73 of Forsythe, the majority supposes that if "the employer investigates but concludes it need go no further, that investigation must be reasonable." But Forsythe doesn't say that *any* "investigation" will do. Forsythe instead requires that the company conduct an *adequate* investigation "to rely on its finding[s]." See id. at 73.

jury could find she was blackout drunk. Also a dead giveaway is her flunking a breathalyzer *hours later* with a BAC (short for blood alcohol content) *4 times* Delta's limit. A rational jury could conclude that Delta should've looked at Lucas's claim — that Caruso had "consented" to "kissing and touching" yet *minutes* later was "too intoxicated" for sexual intercourse — with extreme skepticism (if not a jaundiced eye). And (to continue) given Anderson's Lucas-didn't-cooperate ultimate finding, a logical jury could also conclude that Delta acted negligently by giving Lucas truth-teller status. A reasonable jury (to wrap up) could further find that the glaring inconsistencies in Lucas's story so undermined his credibility as to also call into question the soundness of Delta's actions.

The majority is also mistaken if it thinks that Muldrow v. City of St. Louis, 601 U.S. 346 (2024), damages Caruso's case. Muldrow held that an employee fighting a job transfer under Title VII needn't show "that the harm incurred was 'significant'" or "serious, or substantial, or any similar adjective suggesting that the disadvantage to the employee must exceed a heightened bar," id. at 355 — she "need show only some injury respecting her employment terms or conditions," id. at 359. Caruso's situation isn't like Muldrow, seeing how hers involves an insufficient-investigation claim and Muldrow's doesn't. If we can squeeze any guidance out of Muldrow, it is that judges can't impose heightened-

injury standards not found in statutory texts.  See id. at 354-59.  Yet that is exactly what the majority does by requiring Caruso to show — as part of her insufficient-investigation claim — that a Delta employee re-harassed her after she put Delta on notice.

The majority does no better in arguing against liability under chapter 151B — a statute requiring employers to do a "thorough investigation" of an employee's sexual-harassment claim, not one that's "incomplete, inadequate, insensitive to [her] and deferential to [the accused]."  See Coll.-Town, Div. of Interco, Inc. v. Mass. Comm'n Against Discrimination, 508 N.E.2d 587, 590 (second quote), 594 (first quote) (Mass. 1987).

Relying on Mod. Cont'l/Obayashi v. Mass. Comm'n Against Discrimination, 833 N.E.2d 1130, 1143 (Mass. 2005) ("Mod. Cont'l"), the majority's core premise here is that when "the employer determines based on a reasonable investigation under the circumstances that it cannot find sufficient evidence to support the employee's allegations, employer liability is inappropriate." But the majority's conclusion that Caruso can't win because Delta conducted a "'*reasonable*'" investigation "'under the circumstances as [they] existed' after October 3" (quoting id. at 1140 (emphasis added)) is — for the many reasons already recited — way off the mark:  I re-mention (as a paradigmatic example) that Delta considered the harasser credible despite a bucket full of grounds

not to, while Mod. Cont'l discloses no whisper that the employer there did anything like that.[16]

Trinh v. Gentle Commc'ns, LLC, 881 N.E.2d 1177 (Mass. App. Ct. 2008), offers no aid to the majority either. Interestingly — and tellingly — the majority cites Trinh for the idea that Massachusetts law "focus[es] on the reasonableness of the [company's] investigatory process." Just so. And nothing in Trinh remotely alludes to any requirement that Caruso had to be re-harassed after she reported the harassment to win on her insufficient-investigation theory. The majority also argues that Delta's investigation was just like the one ruled reasonable in Trinh. But night-and-day differences separate Caruso's case from Trinh. Unlike here, Trinh's witnesses corroborated the alleged harasser. See id. at 1185. Also unlike here, Trinh's alleged harassee didn't participate in the company's investigation despite being "given several opportunities" to do so. See id. And (without going through everything again) unlike here, Trinh's at-issue company didn't anoint the accused harasser a truth-teller

_____

[16] The majority makes much of Mod. Cont'l's saying that "'there was no form of sexual harassment perpetrated []after' the investigation" (quoting id. at 1143, though with the majority inserting the empty brackets). But Mod. Cont'l addressed the "remedial steps" the employer took after a "prompt" investigation identified a harasser "within two days" of a harassing event, with the powers-that-be not finding the harasser's story credible despite all the evidence (properly viewed) showing that it wasn't. Id. at 1141-42. So (to reiterate) that case is worlds apart from Caruso's.

despite chameleonic changes in his story and despite his ultimately being labeled uncooperative by the police.

## Ending

I'm not saying that Caruso should win on her Title VII and chapter 151B claims.  I'm just saying that — under the facts (properly seen) and the law (correctly understood) — hers is a story of an insufficient investigation that a reasonable jury could believe.  So she should get a chance to tell it at trial.  And the jurors can then do with it what they will.

The majority viewing this differently, I respectfully — but emphatically — dissent from that part (and only that part) of its decision.